**Lawton CHILES, Jr.,**
**Plaintiff–Appellant,**

**Bob Martinez, Metropolitan Dade County, et al., Intervenors–Appellants,**

v.

**Richard THORNBURGH, Attorney General of the United States, et al., Defendants–Appellees.**

No. 86–5926.

United States Court of Appeals,
Eleventh Circuit.

Feb. 16, 1989.

---

Parker D. Thomson, Thomson Zeder Bohrer Werth & Razook, Cloyce L. Mangas, Jr., Miami, Fla., for Lawton Chiles, Jr.

Gregory C. Smith, Tallahassee, Fla., for Gov. Bob Martinez.

William F. Hamilton, Holland & Knight, Miami, Fla., for Krome Temporary Detainees X and Y, etc.

Thomas H. Robertson, Dade County Atty's Office, Miami, Fla., for Metropolitan Dade County.

Dexter W. Lehtinen, U.S. Atty., Robyn J. Hermann, Mayra Reyler Lichter, Linda Collins Hertz, Peter Prieto, Asst. U.S. Attys., Miami, Fla., for Edwin Meese, et al.

Before KRAVITCH and CLARK, Circuit Judges, and ESCHBACH *, Senior Circuit Judge.

CLARK, Circuit Judge:

In November of 1985, Lawton Chiles, a United States Senator from Florida, filed an action against the Attorney General of the United States and several other Department of Justice (DOJ) officials, and the Secretary of the Department of Defense (DOD), alleging that the federal government was operating Krome Detention Center (Krome), a federal facility located in

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

Dade County, Florida, illegally. After Senator Chiles' complaint was filed, Dade County and Bob Martinez, the Governor of Florida, were granted leave to intervene and filed complaints.[1] Several Krome detainees, individual homeowners living near Krome, and a Homeowners' Association (the proposed intervenors) were not granted leave to intervene.

The district court dismissed the complaints, holding that all the plaintiffs and most of the proposed intervenors lacked standing and that the issues raised by the complaints presented nonjusticiable political questions. For the reasons which follow, we affirm in part, reverse in part, and remand the case to the district court.

### I.

The facts set out below are taken from the verified complaints of Senator Chiles, Governor Martinez, and Dade County. *See* Record, Vol. 1 at Tabs 1, 17, 28. Because the government mounted a facial attack on the plaintiffs' complaints, we must of course accept the allegations in the complaints as true and construe the complaints in favor of the plaintiffs for purposes of our standing analysis. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

### A.

Krome is a minimum-security, short-term Bureau of Prisons (BOP) facility. Since the Mariel Boatlift of 1980,[2] DOJ officials have used Krome to detain aliens awaiting processing, exclusion, or asylum. In 1981, several high-ranking DOJ officials, including the Attorney General and the Commissioner of the Immigration and Naturalization Service (INS), testified before Congress that Krome was not a long-term detention facility for aliens.

In 1981, at Senator Chiles' insistence, Congress enacted Pub.L. No. 97–92, § 128, 95 Stat. 1198 (1981), which provides:

> The Attorney General shall exercise his best efforts to ensure that none of the funds appropriated by this joint resolution may be obligated or expended after March 1, 1982, for the detention of any entrant, any applicant for political asylum or for refugee status, or any other alien which would cause the total number of aliens to exceed five hundred and twenty-five at the facility known as Krome[.]

When he questioned DOJ officials about the status of Krome in 1983, Senator Chiles was assured that Krome remained a temporary detention facility and that a permanent long-term detention facility would be ready by 1985.

Despite their assurances, DOJ officials used Krome as a long-term detention facility to hold large numbers of aliens, including convicted felons, indefinitely. Many of the felons held at Krome were aliens who had finished serving jail sentences for state and federal offenses committed in the United States and were waiting determination of their status by INS. In October of 1985, over forty alien felons rioted and escaped from Krome. Soon afterwards, the INS District Director stated publicly that the alien felons had to be removed from Krome for the protection of the other aliens. Although DOJ officials recognized that events such as the 1985 escape were the result of their policy of housing felons with nonviolent aliens, they did not transfer most of the felons from Krome. By 1986, the felons at Krome had formed gangs which preyed upon nonviolent aliens and regularly assaulted guards. DOJ officials hired improperly trained private security guards to protect the nonviolent aliens and maintain control of Krome.

1. Governor Martinez assumed office on January 6, 1987, and has been substituted for the original intervenor, former Florida Governor Bob Graham. Similarly, Richard Thornburgh has been substituted for Edwin Meese. *See* Fed.R. App.P. 43(c)(1).

2. For a discussion of the Mariel Boatlift, see *Louis v. Nelson,* 544 F.Supp. 973, 978–79 (S.D. Fla.1982).

## B.

The procedural history of this case is important to an accurate understanding of what is at issue on appeal. In 1985, Senator Chiles filed his complaint. Alleging the facts above, the complaint sought several forms of relief: (1) a declaratory judgment that the government's affirmative misrepresentations estopped the government from operating Krome as other than a minimum security, short term facility with a cap of 525 persons, none of whom would be felons ("the estoppel claim"); (2) declaratory and injunctive relief relating to the responsibilities and duties of DOJ, BOP, and INS with respect to Krome;[3] and (3) a writ of mandamus ordering the government to (a) remove all alien felons from Krome and transfer them to medium security or maximum security federal facilities; (b) obey the cap on the number of aliens which can be detained at Krome; and (c) limit detention of aliens at Krome to short-term minimum security processing stays.

Dade County and Governor Martinez sought to intervene. Their complaints alleged the same facts and sought similar relief as Senator Chiles except that they did not assert a separate and distinct equitable estoppel claim. The district court allowed them to intervene. Record, Vol. 1, Tab 45. Subsequently, three additional groups sought to intervene: detainees X and Y individually and as representatives of a class of non-felon detainees, the Kendall Federation Homeowners Association, and two individual homeowners, David Lowry and Dorothy Cissel. The intervenors sought the same relief as Senator Chiles. In an order of dismissal, the district court ended the lawsuit. The court found that Senator Chiles, the Governor, and Dade County did not have standing. He also denied the proposed intervenors right to intervene on the grounds that the detainees had adequate recourse through habeas corpus and that the homeowners and Homeowners Association had failed to allege an injury from the operation of Krome. Finally, the district court held that

the case presented a nonjusticiable political question because it involved policy decisions which were entrusted to the Executive branch.

All plaintiffs and proposed intervenors appealed. The procedural posture of the case, therefore presents *only* the question of the justiciability of the suit, both as to whether the plaintiffs have standing and whether the issues are justiciable. When considering standing, we do not assess the merits of the underlying cause of action because "standing in no way depends on the merits of the plaintiffs contention that the particular conduct is illegal." *Warth v. Seldin,* 422 U.S. at 500, 95 S.Ct. at 2206. Indeed, just as we accept the validity of the plaintiff's factual assertions, we must also accept the validity of the plaintiff's theory of a cause of action, including the theory that estoppel lies against the government when acting in its sovereign capacity, if it engages in affirmative misconduct. *Goldwater v. Carter,* 617 F.2d 697, 702 (D.C. Cir.) (citing *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206), *vacated on other grounds,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979).

## C.

■ The merits of the underlying claim are not irrelevant on appeal. The merits are relevant to the question of mootness—i.e. whether a live case and controversy still exists. It is not enough that a real controversy existed when the lawsuit was filed, the controversy must be a "live" controversy throughout all stages of the case. *Burke v. Barnes,* 479 U.S. 361, 362–64, 107 S.Ct. 734, 736, 93 L.Ed.2d 732 (1987) If the legal or factual basis for the cause of action no longer exists, the case may be moot. In this case, both factual and legal developments create an issue as to whether the entire case or portions of it are moot.

### 1.

■ Since we heard oral argument, Congress passed Pub.L. No. 100–202, which states

3. The parties sought a declaratory judgment as to which of the defendants was responsible for

Krome as well as what those responsibilities entailed.

[E]ffective February 28, 1988, none of the funds appropriated herein shall be available to detain aliens convicted of a felony under State or Federal law at the Krome processing center unless such center has been designated a security level three or higher level correctional facility.

Pub.L. No. 100–202, 101 Stat. 1329 (1987). The INS then elected to remove alien felons from Krome in lieu of losing funding or being required to upgrade Krome to a security level three facility. *See INS' Krome Detention Center: Data Show No Felon Record,* 88 G.A.O. Rep. 62 (1988); *Last Felons Moved Out of Krome,* Miami Herald, Feb. 29, 1988, at B1, col. 4. Since that time, however, it seems that INS has begun to convert Krome into a medium security facility. *See Work to Start to Make Krome More Secure,* Miami Herald, April 2, 1988, at D3, col. 2.

These intervening events, however, are not sufficient to render this case moot. The removal of the felons and upgrading of the facility was in reaction to the passage of Pub.L. No. 100–202. Since, as pointed out below, the statute has recently lapsed, it is quite possible that the defendants may decide to place felons back at Krome, and/or discontinue the efforts to upgrade the facility. Since "[i]ntervening events have not 'irrevocably eradicated the effects of the alleged violation,'" *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct.

1660, 1665, 75 L.Ed.2d 675 (1983) (citation omitted), the entire case is not moot.

2.

There is a more specific problem with mootness, however, which relates to whether the claims are still legally viable. In this case, the plaintiffs basically seek to compel the federal government to operate Krome in compliance with all federal statutes and regulations. More specifically, the plaintiffs want Krome to operate as a minimum security, short-term facility, with a maximum of 525 persons, none of whom are felons. The underlying legal bases for this relief are not immediately apparent from the complaints, but a broad construction of all the complaints reveals at least four legal theories:[4] (1) the equitable estoppel theory;[5] (2) a violation of Pub.L. No. 97–92, § 128, 95 Stat. 1198 (1981); (3) a declaration and injunction under the Declaratory Judgment Act; and (4) violation of some Constitutional provisions.[6]

The plaintiffs at least partially rely on a breach of Pub.L. No. 97–92, § 128, 95 Stat. 1198 (1981), by the Attorney General. Section 128, which mandated that only 525 persons be kept at Krome, was a rider to the 1981 Congressional Appropriations Act, Pub.L. No. 97–92, 95 Stat. 1183. To the extent that the plaintiffs base their claims on this statute, we note that it has lapsed. Riders attached to appropriations bills do not survive past the period for which the funds are appropriated. In *Minis v. Unit-*

---

**4.** The parties do not raise these claims as clearly as we have set them out, however, we note that Fed.R.Civ.P. 8 only requires that the complaint give a short and plain statement showing that the pleader is entitled to relief. Additionally, the complaints should be construed "as to do substantial justice." We believe that all the complaints contain direct or inferential allegations respecting the material elements of the claims set forth above. *See In re Plywood Antitrust Litigation,* 655 F.2d 627, 641 (5th Cir.1981). Furthermore, the lack of precision may result from the fact that most of the appellants intervened (or sought to) into a lawsuit originated by Senator Chiles.

**5.** Although only Senator Chiles explicitly requested a declaratory judgment based on the equitable estoppel theory, the complaints of all the parties put the government on notice that

they might rely on the representations of the defendants as grounds for relief. *See, e.g.,* Dade County Complaint, Record, Vol. 1, Tab 17 at ¶¶ 12, 17.

**6.** The detainees' complaint presents a claim that the management of Krome violates the fifth and eighth amendments. Intervenor's Complaint, Record, Vol. 1, Tab 33, at ¶¶ 1, 10–21. The extent to which excludable aliens are protected by the Constitution is unclear. *See Jean v. Nelson,* 727 F.2d 957, 969–75 (11th Cir.1984) (en banc) (excludable aliens have due process rights outside of admission context when "the plenary authority of the political branches is not implicated."), *rev'd in relevant part,* 472 U.S. 846, 857, 105 S.Ct. 2992, 2998, 86 L.Ed.2d 664 (1985) (holding that Court of Appeals was in error for reaching constitutional claim).

*ed States*, 40 U.S. (15 Pet.) 423, 443, 10 L.Ed. 791, 799 (1841), the Supreme Court had the following to say:

> It would be somewhat unusual to find engrafted upon an act making special and temporary appropriation, any provision which was to have a general and permanent application to all future appropriations. Nor ought such an intention on the part of the legislature be presumed, unless it is expressed in the most clear and positive terms, and where the language admits of no other reasonable interpretation.

We find no intention in the language of § 128 that the condition should extend further than the fiscal year for which the appropriations bill was passed.

■ The lapse of this law renders moot any claim based on this specific statute. In *Burke v. Barnes*, 479 U.S. at 361–62, 107 S.Ct. at 735, the Supreme Court faced a challenge to the "pocket veto" of a bill "conditioning the continuance of United States military aid to El Salvador upon the President's semiannual certification of El Salvador's progress in protecting human rights." The purpose of the Bill was to renew, for the fiscal year ending September 30, 1984, the human rights certification requirements of past legislation. By the time the case reached the Supreme Court, however, the statute had lapsed by its own terms on September 30, 1984. The Court did not reach the issues in the case, which included whether members of Congress had standing to bring the lawsuit, because the lapse of the bill rendered the case moot. *Id.* at 362–64, 107 S.Ct. at 736. Similarly, in this case since the 1981 Appropriations Act has lapsed, any issue dependent on that statute is moot.[7]

Since the plaintiffs rely on several other theories to support their relief, the entire case is not moot. Therefore, we must address the question of whether any of the plaintiffs have standing to challenge the operation of Krome, whether any of the proposed intervenors may intervene, and

regardless of the holdings on standing and intervention, whether the case nonetheless presents a nonjusticiable political question.

## II.

■ The Constitution limits the "judicial power" of federal courts to the resolution of "cases" and "controversies." U.S. Const. Art. III, § 2. "As an incident to the elaboration of this bedrock requirement, [the Supreme Court] has always required that a [plaintiff] have 'standing' to challenge the action sought to be adjudicated in the lawsuit." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). In essence, the question of standing is whether the plaintiff has a "personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which [a] court so largely depends for illumination of difficult ... questions[.]" *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). To have standing a plaintiff must allege, at "an irreducible minimum," that he has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendants and that the injury can fairly be traced to the challenged conduct and is likely to be redressed by a favorable decision. *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758. In addition to meeting these constitutional requirements, a plaintiff may have to satisfy several prudential principles in order to have his claim heard. For example, he must generally assert his own rights and not the rights of third parties, he must be within the zone of interests protected by the provisions at issue, and he cannot raise abstract questions of wide public significance which amount to "generalized grievances" and are best left to the representative branches. *Warth v. Seldin*, 422 U.S. at 499–500, 95 S.Ct. at 2205–06.

---

7. We also note that Pub.L. No. 100–202 has lapsed and therefore renders moot any claim based on it.

The concepts employed in the standing analysis, whether constitutional or prudential are, of course, "not susceptible of precise definition" and "cannot be defined so as to make application of the ... standing requirement a mechanical exercise." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). With these concerns in mind, we turn to analyze whether any of the plaintiffs have standing.

A.

■ The question of whether Senator Chiles has standing is a question of first impression in this circuit.[8] The Supreme Court has recently declined to address the question of congressional standing, *see Bowsher v. Synar,* 478 U.S. 714, 721–722, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583 (1986), but has held that state legislators have standing to challenge the validity of a resolution which amended the state Constitution. *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). The *Coleman* Court found that the legislators had "a plain, direct and adequate interest in maintaining the effectiveness of their votes." 307 U.S. at 438, 59 S.Ct. at 975. The Court did not address the merits, however, holding that the suit presented a political question. 307 U.S. at 453–56, 59 S.Ct. at 981–83.

*Coleman* suggests that under the modern test for standing a legislator's loss of effectiveness in voting constitutes injury in fact. *See Korioth v. Briscoe,* 523 F.2d 1271, 1277 (5th Cir.1975) (state legislator did not have standing to challenge constitutionality of regulatory schemes since legislator alleged no deprivation of right to vote or any other cognizable injury). A precise definition of what type of "loss of effectiveness" of a congressman's vote is judicially cognizable is of crucial significance to the standing inquiry. Too broad a definition would allow a legislator to rush to court whenever he lost a vote and too narrow a definition might allow abuses of the legislative process to go unchecked. Al-

though we realize the importance of this issue, we believe this is not the case for making broad pronouncements as to the scope of congressional standing. In this case, it is clear that by no stretch of the imagination was the "effectiveness" of Senator Chiles' vote diminished at all.

Senator Chiles argues that he has standing merely because he alleged the elements of an equitable estoppel claim. He argues that the detrimental reliance he alleged is sufficient injury to constitute standing. This argument simply begs the question. To allow the simple pleading of an estoppel claim—no matter how insignificant the detrimental reliance—to constitute injury in fact would be to fall prey to what Justice Cardozo described as the "tyranny of labels." *Snyder v. Massachusetts,* 291 U.S. 97, 114, 54 S.Ct. 330, 335, 78 L.Ed. 674 (1934).

■ The question is whether the reliance asserted, namely the assurances Senator Chiles gave to his constituents and fellow lawmakers, his support for certain appropriations measures, and his vote for § 128 in the expectation that it would be obeyed, constitutes injury in fact. It will constitute injury only if such reliance amounts to a "loss of effectiveness" that is judicially cognizable. On the one hand, Senator Chiles may be arguing that his effectiveness suffered because the defendants actions nullified specific votes he cast, specifically the votes for § 128 and Pub.L. No. 100–202. The argument is that the defendants' failure to comply with these laws deprived the Senator of the effectiveness of his vote on the legislation and that the deprivation constitutes a legally cognizable injury. Such an argument is without merit. Senator Chiles is basically arguing that as a Senator he has a right to see that the laws, which he voted for, are complied with. Such a claim of injury, however, is nothing more than a "generalized grievance[ ] about the conduct of the government." *Flast v. Cohen,* 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968). The Supreme Court has repeatedly made clear

---

**8.** The panel is aware that Senator Chiles did not seek reelection to the Senate in 1988. In view of our decision, we elected not to substitute his successor under Fed.R.App.P. 43(c)(1).

that an injury to the " 'right possessed by every citizen, to require that the [g]overnment be administered according to law' " is insufficient to support a claim of standing. *Valley Forge,* 454 U.S. at 483, 102 S.Ct. at 764 (citation omitted).

The Senator's standing argument is really much broader. He argues that because of the misrepresentations by the defendants he voted for some bills and refrained from introducing other legislation. The injury he alleges therefore is that the government's misrepresentations diminished his overall effectiveness as a legislator. The Senator argues that he suffered a cognizable injury because he *believes* he was not as effective as he could have been. If we accepted this argument, the congressional standing inquiry would rely on the subjective view of each Congressman as to his or her effectiveness. This argument loses sight of the underpinning of the standing inquiry. Standing does not rely merely on the identification of *any* injury, but rather on whether there is an injury to a legally cognizable interest. Senator Chiles' argument assumes that he has a legally cognizable interest in being an effective legislator. What constitutes an "effective" legislator is not susceptible to precise definition. However, a legislator does have an expectation that certain procedures will be followed in the legislative process. To the extent that a "procedural" rule is not followed, therefore, a legislator's loss of effectiveness can be objectively measured. In such a case, the legislator may have suffered a legally cognizable injury. In this case, however, Senator Chiles' argument is based purely on his subjective view that he was not effective and therefore is insufficient to support a claim of standing.

Indeed, even if we were to accept the argument that an allegation of general loss of effectiveness without more is sufficient to confer standing, we would be hard pressed to find that Senator Chiles alleged an injury. Senator Chiles has been a forceful advocate for the proper management of Krome. Through his efforts, two laws were passed relating specifically to Krome. By no stretch of the imagination has Senator Chiles been ineffective.

The cases cited by Senator Chiles are of no help to him. Indeed, they support our holding that Senator Chiles has no standing because his subjective belief that his power was diminished is not a cognizable injury. The cases clearly illustrate that the instances in which a legislator has standing are limited. For example, Senator Chiles relies on *Goldwater v. Carter,* 617 F.2d 697, 702 (D.C.Cir.), *vacated on other grounds,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979), in which the D.C. Circuit held that Senator Goldwater had standing to challenge the termination of a treaty by the President. *Goldwater* is clearly distinguishable since it involved a situation in which Senator Goldwater was deprived of his constitutional duty to vote on the termination of the treaty.[9] The deprivation was total, for the Senator had no recourse in the Senate by which to express his views on the termination. In this case, Senator Chiles has not been deprived of any opportunity to use the legislative process to influence the management of Krome.

Senator Chiles places a great deal of reliance on two cases in which the D.C. Circuit held that Congressmen had standing to challenge the use of a pocket veto: *Barnes v. Kline,* 759 F.2d 21 (D.C.Cir. 1984), *vacated as moot sub nom. Burke v. Barnes,* 479 U.S. 361, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987) and *Kennedy v. Sampson,* 511 F.2d 430, 435 (D.C.Cir.1974). The pocket veto cases are distinguishable from this case on several levels. First, the pocket vetoes totally deprived the Congressmen of their "right" to attempt an override. In

---

**9.** In the standing portion of the case, the court assumed the validity of Senator Goldwater's claim that the Constitution required the Senate to ratify the termination of the treaty. In a memorandum opinion, a divided Supreme Court vacated the lower court's opinion and dismissed the case. *Goldwater v. Carter,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979).

Justice Powell believed the case was not ripe. *Id.* at 997, 100 S.Ct. at 533 (Powell, J. concurring). Justice Rehnquist believed that the claim was not justiciable because it was a political question. *See id.* at 1004, 100 S.Ct. at 536 (Rehnquist, J., with Stewart, Stevens, JJ., & Burger, C.J., concurring).

this case, no similar nullification of a vote took place, nor was the Senator totally deprived of a "right" with respect to the enactment of any laws.

Another factor which distinguishes this case from *Goldwater, Burke* and *Kennedy* is that the injury in those cases was objectively discernible. In *Goldwater,* the diminution of congressional influence was from the deprivation of the right to vote on the treaty. In the pocket veto cases, the deprivation was of the right to attempt to override a presidential veto. The *Goldwater* court held that a Congressman only has standing if he alleges a diminution of congressional influence which amounts to a complete nullification of his vote, with no recourse in the legislative process. The diminution of influence is sufficient only if the Congressman points to an objective standard in the Constitution, statutes or congressional rules to show the disenfranchisement. 617 F.2d at 702. *Compare Dennis v. Luis,* 741 F.2d 628, 630 (3d Cir. 1984) (legislator had standing to challenge appointment by executive after legislature rejected it since legislator's right to withhold consent for appointments nullified) *and Moore v. United States House of Representatives,* 733 F.2d 946, 951–52 (D.C.Cir. 1984) (representative had standing to challenge revenue bill since he was deprived of his right to have revenue bills originate in House), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985) *with United States Presbyterian Church v. Reagan,* 738 F.2d 1375, 1381 (D.C.Cir.1984) (representative had no standing to challenge executive order since he was not denied a right to vote); *Holtzman v. Schlesinger,* 484 F.2d 1307, 1315 (2d Cir.1973) (representative had no standing to challenge bombing since she did not allege a denial of right to vote), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974) *and Metzenbaum v. Brown,* 448 F.Supp. 538, 543 (D.D.C.1978) (Senator had no standing to challenge appointment since he alleged no denial of right to vote on appointment). As we have pointed out above, Senator Chiles cannot allege these facts and therefore does not have standing.

Finally, Senator Chiles also suggests that his membership on the Senate Appropriations Committee grants him standing. His argument is based on another D.C. Circuit case, *American Federation of Government Employees v. Pierce,* 697 F.2d 303 (D.C.Cir.1982), in which the D.C. Circuit held that Congressman Sabo did not have standing as a Member of Congress, but did have standing as a member of the House Appropriations Committee, to challenge agency action. *Pierce* does not offer any support to Senator Chiles' position since it is merely an application of the D.C. Circuit caselaw discussed above. The court held that Congressman Sabo did not have standing as a Congressman because he was not deprived of any right to vote on a specific measure. As a member of the Committee, however, he did have a right to vote on the reorganization of HUD and the action by the agency deprived him of that right. Senator Chiles has not alleged any deprivation of a right in relation to his membership on the Senate Appropriations Committee and therefore, his membership does not give him standing.

We hold that Senator Chiles' status as Senator does not confer standing on him to challenge the operation of the Krome facility under the allegations pled. We emphasize the narrow scope of this opinion. We do not hold that legislators never have standing to sue because of their status, nor do we profess to fully define the scope of congressional standing. Instead, we find that in this case, Senator Chiles does not have standing because he has not alleged a nullification of his vote on any specific measures. Furthermore, the alleged loss of effectiveness as a legislator is insufficient in this case to confer standing.

The Senator also argues that he has standing as a citizen and a taxpayer, but those capacities do not afford him standing either. Taxpayers have standing only to challenge the congressional exercise of power under the Taxing and Spending Clause of the Constitution. Senator Chiles has not challenged an exercise of power under these clauses. Additionally, the Senator has not alleged an injury from

the operation of Krome which would afford him standing. As pointed out above, a generalized grievance that the law is not being followed is insufficient to support a claim of standing. *Valley Forge,* 454 U.S. at 483, 102 S.Ct. at 764.[10]

## B.

Governor Martinez alleged that Krome endangers the surrounding residential and business areas. He alleged that there have been riots at Krome and that at least twenty-four detainees had escaped from the facility in October 1985. Record, Vol. 1, Tab 23 at ¶¶ 8–14.

Governor Martinez argues that he has standing to challenge the operation of Krome because as the chief law enforcement officer of the State of Florida he must "take care that the laws be faithfully executed," Fla. Const. Art. 4, § 1, and this duty includes protecting the public from threats of violence. *See also* Fla.Stat. § 14.022 (governor can take action to "prevent overt threats of violence or violence to person or property of citizens of the state"). He asserts that his injury in fact is that the operation of Krome has caused, and will cause, "eruptions of violence" within Florida which he is constitutionally required to prevent.

■ Since Governor Martinez is merely suing on behalf of the state, the question is whether the state may sue the federal government. In *Alfred L. Snapp v. Puerto Rico,* 458 U.S. 592, 609, 102 S.Ct. 3260, 3270, 73 L.Ed.2d 995 (1982), the Supreme Court explained the interests which may afford a state standing. The state may assert an injury to its sovereign interest, that is its ability to exercise its power. The state may also assert an injury to some proprietary interest. Finally, the state may assert some injury to its quasi-sovereign interest, or its *parens patriae* interest. In this case, Governor Martinez asserts that the state has suffered an injury to its sovereign and *parens patriae* interests.

■ A state has standing to sue in its sovereign capacity when it has suffered an economic injury. For example, if the Governor had been forced to call out the National Guard, there is no doubt that the state would have suffered injury in fact. In this case, however, there is no allegation that the state ever expended any of its resources with respect to Krome. The Governor therefore is forced to argue that there is a chance that in the event of future violence he may be required to call out the National Guard. This allegation is pure speculation, especially in light of the history of Krome. The federal government and Dade County have always shouldered the responsibility for quelling violence at Krome. The allegation of future injury, therefore, is too speculative to confer standing. *O'Shea v. Littleton,* 414 U.S. 488, 497–98, 94 S.Ct. 669, 677, 38 L.Ed.2d 674 (1974).[11]

■ A state's interest in the welfare of its citizens—its *parens patriae* interest— may be sufficient to confer standing. The Governor has asserted a valid *parens patriae* interest in protecting the citizens of the state from the dangers of Krome.

---

**10.** Senator Chiles argues that the test for standing which was applied by the district court was too strict. He is correct in arguing that the same principles apply in congressional standing and citizen standing cases. The focus in congressional standing cases, however, is on the sort of injury that allows a legislator to sue *solely* because of his status as a legislator. For example, in this case, Senator Chiles did not suffer an injury sufficient to confer citizenship standing and therefore the question shifted to whether the Senator suffered an injury *as a Senator* which is sufficient to confer standing. The test, therefore, is not more strict, but rather has a different focus.

**11.** The Governor also argues that his injury is more sharply focused than the State of Florida's injury because of his constitutional and statutory duties. *Cf. Graddick v. Newman,* 453 U.S. 928, 931–34, 102 S.Ct. 4, 7–8, 69 L.Ed.2d 1025 (1981) (Powell, Circuit Justice) (attorney general had no standing to request stay of federal court order releasing four hundred state prisoners since governor had responsibility for state prison system). Even if we accept Governor Martinez's argument that his injury is distinct from that of the State, we still would find that the possibility of the Governor being called upon to suppress future violence is too speculative to confer standing.

*Alfred L. Snapp*, 458 U.S. at 609, 102 S.Ct. 3269. The problem is that the Supreme Court recently stated that a state does not have standing as *parens patriae* to bring an action against the federal government to vindicate the rights of its citizens. *Alfred L. Snapp*, 458 U.S. at 609 n. 16, 102 S.Ct. at 3270 n. 16. The *Alfred L. Snapp* Court cited this quotation from *Massachusetts v. Mellon*, 262 U.S. 447, 485–86, 43 S.Ct. 597, 600–01, 67 L.Ed. 1078 (1923)

> While the State, under some circumstances may sue in that capacity for the protections of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae.*

(citations omitted). It is unclear how broadly this pronouncement is to be taken, for *Alfred L. Snapp* itself did not involve a suit by a state against the federal government. *See Alfred L. Snapp*, 458 U.S. at 610, 102 S.Ct. at 3270 (Puerto Rico had standing to sue private defendants to secure federally created rights; federal government stated it had no objection to Commonwealth's standing as *parens patriae*). Furthermore, the *Mellon* Court did "not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress." 262 U.S. at 485, 43 S.Ct. at 600.

We do not believe that this is the case to break new ground, especially since the injury asserted by the Governor is actually suffered by Dade County and not by the state as a whole. Since we hold that Dade County has standing, we believe there is no prejudice in denying standing to Governor Martinez. There is support for this holding in *Commonwealth v. Kleppe*, 533 F.2d 668, 675 (D.C.Cir.), *cert. denied sub nom., Pennsylvania v. Koblinski*, 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976), in which the court held that "factors other than the degree of injury are influential in determining state standing. One of these which is in great measure dependent upon the nature of the injury alleged, is the presence or absence of a more appropriate party or parties capable of bringing the suit."

## C.

Dade County alleged that, as the responsible local government entity for the area where Krome is located, it had been forced to supply additional police and emergency personnel at a substantial cost because of the October 1985 riot and escape and that it had been forced to expose its employees to unnecessary and extreme dangers in attempting to locate and recapture the escaped detainees. It also alleged that as a result of the clear and present danger posed by Krome it has been required to maintain on a contingent basis a sufficient excess police response capacity. Dade County Complaint, Record, Vol. 1, Tab 17 at ¶¶ 1–9.

■ There can be no doubt that Dade County has standing under Article III. The economic detriment suffered by Dade County as a result of the Krome riots and escapes is the epitome of an injury in fact. *See, e.g., City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 242–43, 103 S.Ct. 2979, 2982, 77 L.Ed.2d 605 (1983) (hospital raising Eighth Amendment claims of patient in suit against municipality to recover the cost of services rendered to the patient had standing because it had "performed services for which it [had] not been paid" and sought to redress "its economic loss directly"); *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir.1980) (state and city had standing to challenge census because both entities will suffer injury—reduced aid—from inaccurate census); *City of Willacoochee v. Baldrige*, 556 F.Supp. 551, 553–55 (S.D.Ga.1983) (city had standing to challenge Census Bureau population count because the loss of funds resulting from an undercount constituted a distinct and palpable injury). This economic injury was caused by the inadequate operation of Krome, which led to the riots and escapes. Moreover, it is reasonable to assume that the injury will be redressed by a favorable judicial decision enjoining the executive officials from placing felons in Krome and/or

from allowing overcrowding at the facility. If Krome were operated as a minimum security short-term processing facility, the possibility of an outbreak would diminish and Dade County would not have to keep excess police officers to respond to disturbances.

■ The government argues that Dade County does not have standing because it cannot establish that it has a right of action under the various statutes and regulations under which its claims arise. This argument is unpersuasive. The zone of interests test, which asks whether the interests advanced by the plaintiff are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), is a prudential or self-imposed principle which might counsel judicial restraint. *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760.[12] The application of the test in this case leads to the conclusion that Dade County does have standing.

In *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), citizen groups and individuals living near sites of proposed nuclear power plants sought to declare unconstitutional on due process grounds a federal statute limiting liability for nuclear accidents resulting from the operation of federally licensed private nuclear power plants. After finding that the adverse effects of nuclear power plants—the environmental and aesthetic consequences of thermal pollution—constituted injury in fact, the Supreme Court addressed the contention that the plaintiffs had to "demonstrate a connection between the injuries they claim[ed] and the constitutional rights being asserted," 438 U.S. at 78, 98 S.Ct. at 2633. As the Court noted, the only injury that would satisfy the subject matter nexus to the due process challenge was "the injury that would result from a nuclear accident causing damages in excess of the liability limitation." 438 U.S. at 78 n. 23, 102 S.Ct. at 2633 n. 23. The Court refused to adopt such a requirement outside the context of taxpayer standing, and held that

> [w]here a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met.

438 U.S. at 80–81, 98 S.Ct. at 2634.

The government's invocation of the zone of interests test is akin to the subject matter nexus requirement repudiated in *Duke Power*. Because Dade County has satisfied the requirements of Article III, prudential considerations such as the zone of interests test have generally been satisfied. *Cf. Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760 (suggesting that prudential considerations are to be weighed and involve the balancing of factors).

■ In addition, because Dade County is basically alleging that the government is operating Krome in violation of federal law,[13] it should not have to show that its interests fall within the zone of interests of the statutes and regulations in order to establish its standing to challenge the operation of Krome as *ultra vires*. As the District of Columbia Circuit recently explained,

---

12. The test, which was developed in an administrative setting to expand standing, has engendered a great deal of confusion and come under academic criticism. For a discussion of the controversy surrounding the test, see *Leaf Tobacco Exporters Ass'n v. Block*, 749 F.2d 1106, 1110 & nn. 6–7 (4th Cir.1984) and *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 827 & n. 53 (D.C.Cir.1987) (Edwards, J., concurring in part and dissenting in part).

13. The declaratory judgment claim requests a determination of the responsibilities of each of the defendants with respect to Krome. In addition, the plaintiffs seek an injunction requiring the defendants to comply with all the relevant statutes, regulations and constitutional provisions. The primary portion of the case that is not moot, therefore, has an *ultra vires* aspect to it.

[o]therwise, a meritorious litigant, injured by *ultra vires* action, would seldom have standing to sue since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest. For example, were a case like *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), to arise today, the steel mill owners would not be required to show that their interests fell within the zone of interests of the President's war powers in order to establish their standing to challenge the seizure of their mills as beyond the scope of those powers.

*Haitian Refugee Center*, 809 F.2d at 811 n. 14. In other words, if a particular constitutional or statutory provision was intended to protect a litigant by limiting the authority conferred, the "litigant's interest may be said to fall within the zone protected by the limitation." *Id.*

Even if the zone of interests test has application in cases such as this one which do not involve the Administrative Procedure Act ("the APA"),[14] Dade County is "arguably" within the zone of interests sought to be protected by the statutes and regulations under which its claims arise. *See* 18 U.S.C. § 4001 (control of nonmilitary federal penal institutions is vested in the Attorney General, who may promulgate necessary rules, appoint employees, and classify inmates and provide for their discipline, treatment, care, rehabilitation, and reformation); 18 U.S.C. § 5003 (BOP can house its prisoners in appropriate state facilities and can house state prisoners in its facilities); 8 C.F.R. § 2.1 (the authority of the Attorney General to enforce the immigration laws is delegated to the Commissioner of INS, who may issue appropriate regulations); 8 C.F.R. § 242.2 (INS officials can issue detainers at the request of local law enforcement officials). These statutes and regulations are meant to ensure the orderly administration of federal immigration laws and envision cooperation between local and federal authorities in accomplishing that goal. It is incongruous for the government to argue that Dade County is not within the zone of interests of the federal statutes and regulations dealing with immigration and the detention of aliens when it has in the past sought Dade County's help—in the form of law enforcement assistance—to help regain control of Krome and recapture escaped detainees.

## III.

In their motions to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure,[15] the proposed intervenors alleged

---

**14.** The zone of interests test is used to define which persons are "adversely affected or aggrieved" within the meaning of the APA. *R.T. Vanderbilt Co. v. Occupational Safety & Health Review Comm'n*, 708 F.2d 570, 576 (11th Cir. 1983); *cf. Cooper & Brass Fabricators Council, Inc. v. Dep't of the Treasury*, 679 F.2d 951, 955 (D.C.Cir.1982) (Ginsburg, J., concurring) ("I have reservations about employing a test, initially adopted to 'enlarge ... the class of people who may protest administrative action' to curtail court access where the party seeking judicial review alleges a palpable injury in fact, an injury plainly occasioned by the challenged action, one which would be prevented or redressed by the relief requested.") (citation omitted). Recently the Supreme Court noted that the test is "most usefully understood as a gloss" on the APA standing requirements. *Clarke v. Security Industry Ass'n*, 479 U.S. 388, 400–01, 107 S.Ct. 750, 758 n. 16, 93 L.Ed.2d 757 (1987).

**15.** Rule 24 provides:
 **(a) Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when an application claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 **(b) Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive or-

that their liberty and property interests were violated by the government's operation of Krome. Record, Vol. 1, Tab 33, at 1–2. The district court denied the motions, holding that the detainees had adequate recourse through writs of habeas corpus and that the homeowners and the Homeowners' Association lacked standing. Record, Vol. 1, Tab 45, at 15–16.

Under the "anomalous" rule we have provisional jurisdiction to determine whether the district court erred in concluding that the proposed intervenors were not entitled to intervene under Rule 24. If we find that the district court's disposition of the motions to intervene was correct, "then our jurisdiction evaporates because the proper denial of leave to intervene is not a final decision, and we must dismiss [the] appeals for want of jurisdiction. But if we find that the district court was mistaken, then we retain jurisdiction and must reverse. In either event, we are authorized to decide whether the [motions] to intervene [were] properly denied." *E.E.O.C. v. Eastern Airlines, Inc.*, 736 F.2d 635, 637 (11th Cir.1984).

### A.

The Supreme Court has held that an interest under Rule 24(a)(2) means a "significantly protectable interest," *Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971), but it has never articulated the precise relationship between that interest and the Article III standing requirements. *See Diamond v. Charles*, 476 U.S. 54, 68–70, 106 S.Ct. 1697, 1707, 90 L.Ed.2d 48 (1986) (declining to address whether a party seeking to intervene must satisfy not only the requirements of Rule 24 but also the requirements of Article III). Indeed the lower courts have rendered anomalous decisions on this issue. *See United States v. 36.96 Acres of Land*, 754 F.2d 855, 859 (7th Cir.1985) (interest of proposed intervenor must be greater than the interest sufficient to satisfy standing requirements of APA); *SCLC v. Kelley*, 747 F.2d 777, 779 (D.C.Cir.1984) (interest necessary to intervene is equivalent to interest necessary to confer standing); *United States v. Imperial Irrigation Distr.*, 559 F.2d 509, 521 (9th Cir.1977) (party seeking to intervene need not possess standing necessary to initiate lawsuit), *vacated on other grounds*, 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980); *Indian River Recovery Co. v. The China*, 108 F.R.D. 383, 386 (D.Del.1985) (intervenor need not have standing required to initiate lawsuit).

The reason for this confusion stems from the fact that standing concerns the subject matter jurisdiction of the court. The standing doctrine ensures that a justiciable case and controversy exists between the parties. Intervention under Rule 24 presumes that there is a justiciable case into which an individual wants to intervene. The focus therefore of a Rule 24 inquiry is whether the intervenor has a legally protectable interest in the litigation.[16] It is in this context that the standing cases are relevant, for an intervenor's interest must be a particularized interest rather than a general grievance. *See Howard v. McLucas*, 782 F.2d 956, 959 (11th Cir.1986) (using standing cases to determine that inter-

---

der, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

16. "[T]here is a difference between the question whether one is a proper plaintiff or defendant in an initial action and the question whether one is entitled to intervene.... When one seeks to intervene in an ongoing lawsuit, [justiciability] questions have presumably been resolved.... *A* may not have a dispute with *C* that could qualify as a case or controversy, but he may have a sufficient interest in *B's* dispute with *C* to warrant his participation in the case once it has begun, and the case or controversy limitation should impose no barrier to his admission [as an intervenor]." Shapiro, *Some Thought on Intervention Before Courts, Agencies and Arbitrators*, 81 Harv.L.Rev. 721, 726 (1986) (footnote omitted); *see also* Weinstein, *Litigations Seeking Changes in Public Behavior and Institutions—Some Views on Participation*, 13 U.C.Davis L.Rev. 231, 241 (1980) ("Since the litigation is already pending there is less reason to be as finicky about [the intervenor's] standing than there would be if the intervenor was commencing the suit.")

venors with only generalized grievance could not intervene); *Athens Lumber Co., Inc. v. Federal Election Commission,* 690 F.2d 1364, 1366 (11th Cir.1982) (citing standing cases to determine that intervenor's claimed interest that unions would be financially overwhelmed in federal elections too generalized to support claim for intervention of right). We therefore hold that a party seeking to intervene need not demonstrate that he has standing in addition to meeting the requirements of Rule 24 as long as there exists a justiciable case and controversy between the parties already in the lawsuit. The standing cases, however, are relevant to help define the type of interest that the intervenor must assert.[17]

## B.

A party seeking to intervene as of right under Rule 24(a)(2) must show that: (1) his application to intervene is timely; (2) he has an interest relating to the property or transaction which is the subject of the action; (3) he is so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and (4) his interest is represented inadequately by the existing parties to the suit. *Athens Lumber,* 690 F.2d at 1366. If he establishes each of the four requirements, the district court must allow him to intervene.

A party seeking to intervene under Rule 24(b)(2) must show that: (1) his application to intervene is timely; and (2) his claim or defense and the main action have a question of law or fact in common. The district court has the discretion to deny intervention even if both of those requirements are met, and its decision is reviewed for an abuse of discretion. *Sellers v. United States,* 709 F.2d 1469, 1471 (11th Cir. 1983).

**17.** We need not address the issue of whether an intervenor who seeks to raise a claim unrelated to a case or controversy that already exists must have standing with respect to that claim. *See generally* 7C C. Wright, A. Miller & M. Kane,

## 1.

In determining whether the detainees' motion to intervene was timely, we must consider the length of time during which the detainees knew or reasonably should have known of their interest in the case before moving to intervene, the extent of prejudice to the existing parties as a result of the detainees' failure to move for intervention as soon as they knew or reasonably should have known of their interest, the extent of prejudice to the detainees if their motion is denied, and the existence of unusual circumstances militating either for or against a determination that their motion was timely. *United States v. Jefferson County,* 720 F.2d 1511, 1516 (11th Cir.1983). We must also keep in mind that "[t]imeliness is not a word of exactitude or of precisely measurable dimensions. The requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice." *McDonald v. E.J. Lavino Co.,* 430 F.2d 1065, 1074 (5th Cir. 1970). We believe that the detainees' motion to intervene was timely. It was filed only seven months after Senator Chiles filed his original complaint, three months after the government filed its motion to dismiss, and before any discovery had begun. None of the parties already in the lawsuit could have been prejudiced by the detainees' intervention. *Cf. Diaz v. Southern Drilling Corp.,* 427 F.2d 1118, 1125–26 (5th Cir.) (motion to intervene more than a year after the action was commenced was timely when there had been no legally significant proceedings other than the completion of discovery and motion would not cause any delay in the process of the overall litigation), *cert. denied,* 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970).

Under Rule 24(a)(2), the detainees' intervention must be supported by a " 'direct, substantial, legally protectible interest in the proceeding.' ... In essence, the [de-

*Federal Practice and Procedure,* § 1921, at 492 (2d ed. 1986) (discussing assertion of additional claims by an intervenor). In this case, the detainees' claims are related to the underlying suit and the detainees clearly would have standing.

tainees] must be at least ... real part[ies] in interest in the transaction which is the subject of the proceeding." *Athens Lumber*, 690 F.2d at 1366 (citations omitted). The detainees' interest need not, however, "be of a legal nature identical to that of the claims asserted in the main action." *Diaz*, 427 F.2d at 1124. Our inquiry on this issue "is 'a flexible one, which focuses on the particular facts and circumstances surrounding each [motion for intervention].'" *United States v. Perry County Board of Education*, 567 F.2d 277, 279 (5th Cir.1978) (quoting *United States v. Allegheny–Ludlum Indus., Inc.*, 517 F.2d 826, 841 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976)).

■ There is no doubt that the detainees satisfy the interest requirement of Rule 24(a)(2). The detainees are being held at Krome, the axis on which the lawsuit turns. They claim that the government's operation of Krome—e.g., its practice of keeping alien felons along with nonviolent alien detainees and its hiring of untrained security personnel—is in violation of minimum federal and state prison standards and threatens them with an imminent risk of harm. The detainees are analogous to prisoners who have standing to sue over the conditions of the institution where they are detained. *See, e.g., Hutto v. Finney*, 437 U.S. 678, 686, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978); *Jones v. Diamond*, 636 F.2d 1364, 1367 (5th Cir.) (en banc), *cert. dismissed*, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981); *Bono v. Saxbe*, 620 F.2d 609, 612 (7th Cir.1980). By any imaginable yardstick, the detainees have a "direct, substantial, legally protectible interest" in the lawsuit challenging the operation of Krome and are asserting legal rights of their own. *See* 7C C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1908, at 285 (2d ed. 1986) ("in cases challenging various statutory schemes as unconstitutional or as improperly interpreted and applied, the courts have recognized that the interests of those who are governed by those schemes are sufficient to support intervention").

■ The nature of the detainees' interest and the effect that the disposition of the lawsuit will have on their ability to protect that interest are closely related issues. "The second cannot be answered without reference to the first." *Hobson v. Hansen*, 44 F.R.D. 18, 30 (D.D.C.1968). We think the detainees are so situated that the disposition of the lawsuit will, as a practical matter, impair their ability to protect their interests. As we have already discussed, the detainees are confined in the institution whose operation is being challenged. There is therefore a conjunction of a claim to and an interest in the very transaction which is the subject of the main action, and the *stare decisis* effect of a decision suggests the practical disadvantage requisite for intervention. Where a party seeking to intervene in an action claims an interest in the very property and very transaction that is the subject of the main action, the potential *stare decisis* effect may supply that practical disadvantage which warrants intervention as of right. *Atlantis Development Corp. v. United States*, 379 F.2d 818, 829 (5th Cir. 1967). The detainees' ability to litigate the government's operation of Krome in a separate lawsuit might be an exercise in futility if the instant lawsuit was decided in favor of the government.

■ Because the detainees' interest is similar to, but not identical with, that of Dade County, we must determine whether the detainees' interest is adequately represented. The Supreme Court has held that the inadequate representation requirement "is satisfied if the [proposed intervenor] shows that representation of his interest 'may be' inadequate" and that "the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972). Thus, the detainees "should be allowed to intervene unless it is clear that [Dade County] will provide adequate representation." 7C C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1909, at 319 (2d ed. 1986). The fact that the interests are similar does not mean that approaches to litigation will be the same.

*Trbovich,* 404 U.S. at 539, 92 S.Ct. at 636–37. Dade County may decide not to emphasize the plight of the aliens held at Krome but focus instead on the effect that Krome has on those who live outside its walls. After all, Dade County is mainly concerned with the expenditures that have to be made because of Krome. We conclude that this possibility sufficiently demonstrates that the detainees' interests are not adequately represented.[18]

Our foregoing discussion indicates that the district court erred in not allowing the detainees to intervene as of right under Rule 24(a)(2). We therefore reverse its ruling. On remand, the detainees are to be treated as original parties and stand on equal footing with the original parties. *Marcaida v. Rascoe,* 569 F.2d 828, 831 (5th Cir.1978).

### 2.

■ We need address only one of the requirements of Rule 24—inadequate representation—to dispose of the argument of the homeowners and the Homeowners' Association that they were entitled to intervene as of right. Unlike the detainees, the homeowners and the Homeowners' Association have an interest which is *identical* to Dade County: the prevention of riots and escapes from Krome and the protection of nearby residents. There is no indication whatsoever that the representation rendered by Dade County would be inadequate. *See Athens Lumber,* 690 F.2d at 1366 (where interest of proposed intervenor is the same as that of one of the parties, court can presume that the interest is adequately represented).

■ As to permissive intervention under Rule 24(b)(2), we cannot say that the district court abused its discretion with regard to the homeowners and the Homeowners' Association. The duplicative nature of the claims and interests they asserted threatens to unduly delay the adjudication of the rights of the parties in the lawsuit and makes it unlikely that any new light will be shed on the issues to be adjudicated. Having concluded that the homeowners and the Homeowners' Association were not entitled to intervene as of right, and that the district court did not abuse its discretion with regard to permissive intervention under the anomalous rule, we find that we are without jurisdiction. We therefore dismiss the appeals of the homeowners and the Homeowners' Association. *Eastern Airlines,* 736 F.2d at 637.

### IV.

The government contends, and the district court found, that the issues raised by the complaints present a nonjusticiable political question. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations *constitutionally* committed for resolution to the halls of Congress or the confines of the Executive Branch.... But under the Constitution, one of the judiciary's characteristic roles is to interpret statutes, and [the courts] cannot shirk this responsibility merely because [the] decision may have significant political overtones." *Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 229–230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986) (emphasis added).[19]

---

**18.** The government's argument that the detainees had adequate recourse through writs of habeas corpus ignores the fact that the proper test for intervention is set forth in Rule 24. It is also based on a jaundiced view of part of the relief sought by the detainees—the limiting of alien detentions at Krome to short-term minimum security processing stays—as a demand for release from confinement. *Cf. Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed. 2d 439 (1973).

**19.** "Prominent on the surface of any case held to involve a political question is found a textual-

ly demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various

At its heart, this case involves challenges to the government's detention of aliens at Krome. There is no evidence in the Constitution that federal courts must refrain from reviewing decisions dealing with immigration. Although the Constitution expressly delegates to Congress the power to make naturalization laws, *see* U.S. Const. Art. I, § 8, cl. 4, federal courts have regularly entertained challenges to immigration decisions made by the Executive and Legislative branches. *See, e.g., Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (INS detention policy); *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed. 2d 317 (1983) (alien's *de facto* deportation by House of Representatives); *Haitian Refugee Center, Inc. v. Gracey,* 600 F.Supp. 1396, 1403–07 (D.D.C.1985) (interdiction of aliens on the high seas), *aff'd on other grounds,* 809 F.2d 794 (D.C.Cir.1987).

 The government argues that the case presents a political question because the relief sought would require restructuring the management of Krome which was delegated to the Executive Branch by Congress. The government not only misconstrues the relief sought, but also mixes the question of whether a case is justiciable with the standard of review that is applied. It may be that since questions of policy are involved, the standard of review should be narrow, but that does not require federal courts to abstain from reviewing the question of whether the "policy" complies with the Constitution, statutes, and regulations. *Mathews v. Diaz,* 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). In this case, plaintiffs are seeking declaratory and injunctive relief as to the responsibilities *between* the various defendants for the operation of Krome, as well as a declaration as to the defendants' duties in operating the facility. Resolution of those claims requires the interpretation of the Constitution, statutes, and regulations which is entirely within the power of the federal judiciary. As *Japan Whaling Ass'n* and cases like *Jean* and *Cha-*

*dha* make clear, we cannot avoid our duty to interpret statutes simply because some aspect of immigration policy may come under scrutiny.

 Additionally, the plaintiffs are alleging that regardless of the duties imposed by statute, the defendants are estopped from maintaining Krome as a long term facility, with over 525 persons and felons, because of the affirmative misrepresentations of the government officials. That an estoppel claim does not by itself create a political question is illustrated by the fact that federal courts have previously entertained challenges to government action based on a theory of governmental estoppel. *See, e.g., Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *FDIC v. Harrison,* 735 F.2d 408, 410–11 (11th Cir.1984); *Deltona Corp. v. Alexander,* 682 F.2d 888, 892 (11th Cir.1982). In holding that the case does not present a political question, we express no opinion on the merits of this challenge to the operation of Krome.

## V.

The district court correctly found that Senator Chiles and Governor Martinez do not have standing and did not abuse its discretion in denying the motion of the homeowners and the Homeowners' Association for leave to intervene. It erred, however, in finding that Dade County did not have standing, denying the motion of the detainees for leave to intervene, and concluding that the issues raised by the complaints presented political questions.

We therefore affirm in part, reverse in part, and remand for proceedings consistent with this opinion.[20]

AFFIRMED in part, REVERSED in part, and REMANDED.

departments on one question." *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710.

**20.** Given our disposition, we need not rule on the government's motion to strike certain portions of the appendix filed by the appellants.