989 F.2d 994
 25 Fed.R.Serv.3d 766
 MILLE LACS BAND OF CHIPPEWA INDIANS; Arthur Gahbow; Walter
Sutton; Carleen Benjamin; Joseph Dunkley,
Plaintiffs-Appellees,
v.
STATE OF MINNESOTA; Minnesota Department of Natural
Resources; Joseph Alexander, Commissioner of
Natural Resources, Defendants,
County of Aitkin; County of Benton; County of Chisago;
County of Crow Wing; County of Isanti; County of Kanabec;
County of Mille Lacs; County of Morrison; County of Pine,
Intervenors-Appellants.
MILLE LACS BAND OF CHIPPEWA INDIANS; Arthur Gahbow; Walter
Sutton; Carleen Benjamin; Joseph Dunkley,
Plaintiffs-Appellees,
v.
STATE OF MINNESOTA; Minnesota Department of Natural
Resources; Joseph Alexander, Commissioner, Defendants,
John W. Thompson; Jenny Thompson; Joseph N. Karpen; Leroy
Burling; Glenn E. Thompson; Gary M. Kiedrowski,
Intervenors-Appellants.
Save Lake Mille Lacs, Association, Amicus Curiae.
 Nos. 92-1550, 92-2962.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 18, 1992.
Decided April 5, 1993.
 
 Jeffry Robert Chaffee, Milaca, MN, for intervenors-appellants County of Aitken et al.
 Stephen G. Froehle, Minneapolis, MN, for intervenors-appellants John W. Thompson et al.
 Marc D. Slonim, John B. Arum, Seattle, WA, on the brief, for plaintiffs-appellees.
 Before McMILLIAN, Circuit Judge, LAY, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 This appeal arises out of the District Court's denial of two motions to intervene in litigation between the Mille Lacs Band of Chippewa Indians (the Band) and the State of Minnesota (the state). One motion to intervene was brought by the counties of Aitkin, Benton, Chisago, Crow Wing, Isanti, Kanabec, Mille Lacs, Morrison, and Pine (the counties). 140 F.R.D. 390. The other motion to intervene was brought by John W. Thompson, Jenny Thompson, Joseph N. Karpen, Leroy Burling, Glenn E. Thompson, and Gary M. Kiedrowski (the landowners). Both groups appeal the District Court's denial of their motions to intervene as of right.[1] For the reasons set forth below, we reverse.
 
 I.
 
 2
 The litigation between the Band and the State of Minnesota arises out of a treaty concluded in 1837 between the United States and the Chippewa Nation (the 1837 treaty). Articles of a Treaty, July 29, 1837, U.S.-Chippewa Nation, 7 Stat. 536. Under the terms of that treaty, the Chippewa Nation ceded to the United States a tract of land much of which is located in what is now Minnesota. Id. art. 1. The treaty, however, provided that "[t]he privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States." Id. art. 5.
 
 
 3
 The State of Minnesota has adopted natural resource laws that regulate hunting, fishing, and gathering, and has applied these laws to Band members within the ceded territory. In 1990, the Band brought suit in the District Court against the State of Minnesota, the Minnesota Department of Natural Resources, and the Commissioner of the Minnesota Department of Natural Resources alleging that these laws violated Band members' rights under the 1837 treaty. The Band sought a declaratory judgment affirming that the Band retained rights under the 1837 treaty and defining the limits on permissible state regulation of those rights. The Band also sought an injunction barring the State of Minnesota from interfering with Band members' rights under the treaty.
 
 
 4
 The District Court divided the litigation into two phases. The first phase is intended to resolve the threshold issues of whether the Band retains any rights under the 1837 treaty and whether such rights extend to land that is privately owned. If the first phase results in a finding that the Band does retain rights under the 1837 treaty, a second phase will address the validity of state laws regulating these rights. Under the original schedule for the first phase, all jurisdictional motions and motions seeking the addition of parties were to be filed by June 28, 1991, discovery was to be completed by December 31, 1991, and the first phase of the case was to be ready for trial by May 1, 1992. Subsequently, in mid-March 1991, the deadline for discovery was extended to September 25, 1992, and the date when the first phase of the case was to be ready for trial to early 1993.
 
 
 5
 On July 3, 1991, the counties filed a motion to intervene in the litigation. The counties are nine Minnesota counties, each located partially or entirely within the territory ceded to the United States under the 1837 treaty. The counties assert two principal interests that may be adversely affected by this litigation. First, the counties own certain land outright and they have a beneficial interest in tax-forfeited land that they manage, derive revenue from, and sell; the counties argue that this litigation will affect the use and value of these lands. Second, the counties assert an interest in law enforcement; they argue that recognition of a right of entry onto private lands by persons exercising treaty rights will require the counties to devote additional resources to enforcing trespass laws and will create a likelihood of violence to which the counties will have to respond.
 
 
 6
 On March 30, 1992, the landowners filed their motion to intervene in the litigation. The landowners are persons with interests in real estate in the ceded territory; these interests include the ownership of homes, of a resort on Lake Mille Lacs, and of woodlands used primarily for hunting. The landowners assert that their interests in land will be adversely affected if the result of the litigation between the Band and the State of Minnesota is a decision that Band members' rights extend to privately owned land. Even absent a result extending treaty rights to privately owned land, however, the landowners assert that they have an interest in this litigation; the landowners claim that if the Band is afforded rights under the 1837 treaty, even on public land, this will deplete fish and game stocks and lower landowners' property values.
 
 
 7
 The Band opposed both motions to intervene; the state took no position on the motions. The District Court denied both motions.[2] It denied the counties' motion on the ground that the counties had not demonstrated that their interests were inadequately represented in the litigation. It denied the landowners' motion as untimely and on the ground that, like the counties, the landowners had not demonstrated that their interests were inadequately represented in the litigation. Both the counties and the landowners appeal.
 
 II.
 
 8
 The rule governing intervention as of right provides:
 
 
 9
 Upon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 
 
 10
 Fed.R.Civ.P. 24(a). We previously have stated that this rule requires that one seeking intervention file a timely application, and that the applicant then satisfy a tripartite test: 1) the party must have a recognized interest in the subject matter of the litigation; 2) that interest must be one that might be impaired by the disposition of the litigation; and 3) the interest must not be adequately protected by the existing parties. Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action, 558 F.2d 861, 869 (8th Cir.1977).
 
 
 11
 Both the counties and the landowners easily satisfy two of the requirements for intervention as of right. First, both groups have interests in land in the ceded territory. The litigation between the Band and the State of Minnesota will determine Band members' rights to hunt, fish, and gather on land throughout the ceded territory, including land the counties and the landowners own. The result of the litigation also may affect the proposed intervenors' property values. See id. (holding that proposed intervenors' interests in protecting their property values are protectable interests). The parties thus have recognized interests in the subject matter of the litigation. Second, a judgment or settlement favorable to the Band may impair those interests, since it may permit Band members to exercise treaty rights upon the proposed intervenors' land. Even if the Band's rights under the 1837 treaty are limited to public land, a resulting depletion in fish and game stocks may reduce the proposed intervenors' property values. See id. ("[i]n order to prevent what they view as an incipient erosion of their property values, the applicants must participate in this litigation").
 
 
 12
 Whether the counties and the landowners are entitled to intervention of right, then, requires an analysis of two issues. The first issue, raised only in connection with the landowners' attempt to intervene, is whether the motion to intervene was timely. If the landowners' motion was not timely filed, the landowners are barred from intervening. The second issue is whether the counties' and the landowners' interests are being inadequately represented by existing parties. As a general proposition, whether or not a person is entitled to intervention as a matter of right is a question of law that we review de novo. United States v. Metropolitan St. Louis Sewer Dist. (MSD), 883 F.2d 54, 55 (8th Cir.1989). We review the trial court's ruling on the timeliness of a motion to intervene, however, only for abuse of discretion. Jenkins by Agyei v. Missouri, 855 F.2d 1295, 1316 (8th Cir.1988), cert. denied, 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989) and aff'd in part on other grounds, rev'd in part on other grounds, 495 U.S. 33, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990).
 
 III.
 
 13
 Whether a motion to intervene is timely is determined by considering all the circumstances of the case. Jenkins by Agyei, 855 F.2d at 1316. No ironclad rules govern this determination. Compare Dimond v. District of Columbia, 792 F.2d 179, 193 (D.C.Cir.1986) (allowing intervention after judgment for purposes of appeal) with Arkansas Elec. Energy Consumers v. Middle S. Energy, Inc., 772 F.2d 401, 403 (8th Cir.1985) (denying motion for intervention filed twelve days after commencement of action where hearing already had been held and temporary restraining order issued). In determining timeliness, factors that bear particular consideration are the reason for the proposed intervenor's delay in seeking intervention, how far the litigation has progressed before the motion to intervene is filed, and how much prejudice the delay in seeking intervention may cause to other parties if intervention is allowed. Arkansas Elec. Energy Consumers, 772 F.2d at 403.
 
 
 14
 Initially, we address the Band's argument that, because the landowners' motion seeking intervention was not filed until nine months after the deadline for motions to add parties, the landowners' motion was untimely. The fact that the landowners sought intervention after the June 28, 1991 deadline does not automatically preclude them from intervening. The record does not clearly establish whether the deadline applied only to motions brought by existing parties, or whether the trial court intended that the deadline also cover motions to intervene. Even if the deadline was intended to apply to motions to intervene, the mere fact that the landowners moved to intervene after it had expired would not necessarily mean that their motion was untimely. See Liddell v. Caldwell, 546 F.2d 768 (8th Cir.1976) (allowing intervention even though intervenors filed their motion to intervene after the deadline for filing such motions), cert. denied, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977). Rather, the timeliness of the landowners' motion must be determined by looking at all of the Arkansas Electric Energy Consumers factors.
 
 
 15
 The landowners' motion to intervene was filed on March 20, 1992 some eighteen months after suit had been commenced and nine months after the deadline for filing motions to add parties. The landowners argue that they filed the motion to intervene promptly after a joint motion filed by the Band and the State of Minnesota made it clear to them that the Band's rights under the 1837 treaty might extend to privately owned lands. The landowners claim that, prior to the filing of this joint motion, they lacked any way of knowing that their interests might be so affected. This explanation, however, is belied by the fact that both the answer filed by the State of Minnesota, and a scheduling order filed by the District Court on April 9, 1991 contain references at least as obvious as that in the March 1992 motion to the fact that the Band's treaty rights may extend to privately owned lands. The landowners' proffered explanation for their delay is thus not very persuasive.
 
 
 16
 On the other hand, although the landowners' motion to intervene was not filed until March 20, 1992, the underlying litigation scarcely had progressed beyond the initial filing of pleadings by that date. The parties' efforts up to that point had been concentrated on negotiating a settlement, an effort that apparently had reached a temporary impasse, and they had not yet even exchanged discovery requests. The Band asserts that it had been engaged in intensive trial preparation efforts involving the assembly and review of thousands of historical documents. Such preparation, however, could equally well have been done before the case was filed, in which case it clearly would not have barred intervention by interested parties. We are reluctant to preclude intervention based on a party's trial preparation work outside the discovery process. Although a substantial time passed between the commencement of the suit and the landowners' motion to intervene, the legal proceedings were still at a preliminary stage.
 
 
 17
 Finally, the landowners' delay in moving to intervene did not prejudice the existing parties. As of the date the landowners sought to intervene, the parties had not even commenced discovery. Thus the landowners' tardiness in seeking intervention, had intervention promptly been allowed, probably would not have delayed a trial of the case. The Band makes much of the fact that the landowners oppose any recognition of Band rights under the 1837 treaty and asserts that the landowners oppose any settlement. Settlement negotiations, however, were at an impasse when the landowners sought to intervene. Prejudice that results from the mere fact that a proposed intervenor opposes one's position and may be unwilling to settle always exists when a party with an adverse interest seeks intervention. Any prejudice to the Band's ability to settle results not from the fact of the landowners' delay in seeking intervention, but rather from the landowners' presence in the suit. Rule 24(a) protects precisely this ability to intervene in litigation to protect one's interests.
 
 
 18
 In sum, although the landowners delayed in filing their motion to intervene, the underlying litigation had not progressed significantly by the time they moved to intervene and the delay in seeking intervention did not prejudice the existing parties. On these facts, we hold that the District Court's ruling that the landowners' motion to intervene was untimely must be set aside as an abuse of discretion.
 
 IV.
 
 19
 Finally, the counties and the landowners are not entitled to intervene in the litigation if their interests are adequately represented by existing parties. Typically, persons seeking intervention need only carry a "minimal" burden of showing that their interests are inadequately represented by the existing parties. Trbovich v. United Mine Workers, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686; Planned Parenthood of Minnesota, Inc., 558 F.2d at 869. In certain circumstances, however, the burden of demonstrating inadequate representation is higher.
 
 
 20
 In Environmental Defense Fund, Inc. v. Higginson, 631 F.2d 738 (D.C.Cir.1979) (per curiam), an environmental group sued federal officials to compel them to prepare a comprehensive environmental impact statement regarding federal water resource projects in the Colorado River Basin. Four states, including Colorado and Nevada, were allowed to intervene in the suit as defendants. The court denied intervention to a group of water districts in those two states saying:
 
 
 21
 Under the parens patriae concept ... a state that is a party to a suit involving a matter of sovereign interest is presumed to represent the interests of all its citizens. Thus, to intervene in a suit in district court in which a state is already a party, a citizen or subdivision of that state must overcome this presumption of adequate representation.
 
 
 22
 Id. at 740; see also Pennsylvania v. Rizzo, 530 F.2d 501, 505 (3rd Cir.) ("a presumption of adequate representation generally arises when the representative is a governmental body or officer charged by law with representing the interests of the absentee"), cert. denied, 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976). We applied this presumption of adequate representation in Jenkins by Agyei, 855 F.2d at 1317 & n. 23 (denying a motion to intervene as untimely, but stating that even if the motion was timely, the error was harmless since the proposed intervenor had "simply failed to overcome the presumption that its interests [were] adequately represented by the State.").
 
 
 23
 The Band argues that the presumption of adequate representation applies to both the counties and to the landowners. It points out that under Minnesota law, the State of Minnesota holds public natural resources, such as fish and game, "in its sovereign capacity for the benefit of all the people of the state," Minn.Stat.Ann. § 97A.025 (West Supp.1993), and argues that the state's management of fish and game is therefore a matter of sovereign interest. The Band reasons that Minnesota, which is seeking to apply its fish and game laws to the Band, is a party to a suit involving a matter of sovereign interest, that the proposed intervenors are citizens of Minnesota, and that the presumption of adequate representation therefore applies. We disagree.
 
 
 24
 In Dimond v. District of Columbia, a victim of an automobile accident brought a suit challenging the District of Columbia's no-fault insurance law. Specifically, the accident victim challenged a provision of the law providing that a person who was injured in an automobile accident, but who incurred less than $5000 of medical expenses, was not entitled to bring a tort action to recover his noneconomic losses. The trial court held that the $5000 threshold was unconstitutional. Following the trial court's ruling, several automobile insurance companies sought to intervene in the action for the purpose of arguing on appeal that the threshold should not be found unconstitutional.
 
 
 25
 The Dimond court held that no presumption of adequate representation applied, reasoning:
 
 
 26
 A government entity such as the District of Columbia is charged by law with representing the public interest of its citizens. State Farm, on the other hand, is seeking to protect a more narrow and "parochial" financial interest not shared by the citizens of the District of Columbia. The District would be shirking its duty were it to advance this narrower interest at the expense of its representation of the general public interest. Since State Farm's interest cannot be subsumed within the shared interest of the citizens of the District of Columbia, no presumption exists that the District will adequately represent its interests.
 
 
 27
 Dimond, 792 F.2d at 192-93 (citation omitted); cf., e.g., Higginson, 631 F.2d 738 (applying presumption of adequate representation where water districts seeking intervention, like existing governmental parties, sought to avoid requirement that federal officials prepare an environmental impact statement analyzing federal water resource projects).
 
 
 28
 We believe that the rationale of Dimond applies equally to this case. The counties own certain land outright, and they have a beneficial interest in tax-forfeited land that they manage, derive revenue from, and sell. Any recognition of treaty rights would allow Band members to hunt and fish on public county land. The counties assert that such recognition would also affect the value of the property that they own and their ability to manage profitably and to derive revenue from tax-forfeited land. The counties' interests in land are narrower interests not subsumed in the general interest Minnesota asserts in protecting fish and game.
 
 
 29
 Similarly, the landowners have interests in land that may be affected by this litigation. Although the Band has represented during the litigation that it does not seek to gain rights to hunt, fish, and gather on privately owed lands, the landowners express doubt as to whether this representation is binding. Even if the Band's rights ultimately are found to apply only on public lands, the landowners' property values may be affected by the depletion of fish and game stocks. Again, these interests are narrower and more parochial interests than the sovereign interest the state asserts in protecting fish and game.
 
 
 30
 Because the counties and the landowners seek to protect local and individual interests not shared by the general citizenry of Minnesota, no presumption of adequate representation arises. The proposed intervenors need only carry a minimal burden of showing inadequate representation. Although the Band notes that the counties' and the landowners' proposed answers are almost identical to the answer filed by the state, there is no assurance that the state will continue to support all the positions taken in its initial pleading. Moreover, if the case is disposed of by settlement rather than by litigation, what the state perceives as being in its interest may diverge substantially from the counties' and the landowners' interests. For example, although the state's interest in natural resources may lead it to seek no more than that endangered species are protected and that wildlife stocks are preserved at certain levels, the counties and the landowners will be more concerned with ensuring that any settlement does not impair their property values. A potential conflict of this sort is sufficient to satisfy the proposed intervenors' minimal burden of showing that representation of their interests by the existing parties may be inadequate. See Dimond, 792 F.2d at 193.
 
 
 31
 The Band points out that the state holds title to the tax-forfeited land and that it also owns state parks, state forests, and state game refuges in the ceded territory. The Band argues that the state's ownership of land means that the state, in practice, will adequately represent the counties' and the landowners' interests. The state's ownership of land, however, does not mean that the state has the same interests as the counties or the landowners in the litigation. The parties appear to agree that the counties own the entire beneficial interest in tax-forfeited land, thus the state's ownership of naked title to such land does not imply any interest in its value. Also, ownership of state parks and forests does not support a claim that the state has the same interests as the counties and the landowners in land use and property values, since we presume that the state, unlike the landowners and, in many cases, the counties too, has little interest in the current market value of its lands. Different owners of different pieces of land used for different purposes may have dramatically different interests to protect. The interests that the counties and the landowners assert in their property are different from the state's interests in its lands. The mere fact that the state has interests in land is no guarantee that it will adequately represent the counties and the landowners' interests.
 
 
 32
 We also address briefly the Band's argument that our decision in Leech Lake Area Citizens Committee v. Leech Lake Band of Chippewa Indians, 486 F.2d 888 (8th Cir.1973) should guide our decision in this case. In that case, which also involved the exercise of hunting and fishing rights by a band of Chippewas, we summarily affirmed the trial court's denial of a motion to intervene brought by a citizens' committee after the entry of a consent judgment. The suit differed from the case sub judice in that it involved only on-reservation treaty rights. Thus, the case raised no issues concerning the Chippewas' right to hunt, fish, and gather on public and private lands outside the reservation. Moreover, our summary affirmance does not disclose what interests were asserted by the proposed intervenors but found insufficient to support intervention. For these reasons, we reject the argument that Leech Lake Area Citizens Committee controls our decision.
 
 V.
 
 33
 For the reasons stated, we reverse the decisions of the District Court denying the counties' and the landowners' motions to intervene and order that the movants be granted leave to intervene in the Mille Lacs Band of Chippewa Indians' action against the State of Minnesota.
 
 
 34
 The landowners have filed a motion to supplement the record, principally by adding a proposed settlement between the Band and the state made public only after oral argument. We have reviewed the materials submitted, but our opinion does not rely on them and our reasoning is not affected by them. Thus we need not decide whether to grant the landowners' motion.
 
 
 
 [1]
 Although both groups originally also sought permissive intervention under Federal Rule of Civil Procedure 24(b)(2), neither group has appealed from the District Court's denial of permissive intervention
 
 
 [2]
 In each case the District Court was presented with the issue in the context of an appeal from an order entered by a magistrate judge. The magistrate judge who considered the counties' motion to intervene allowed intervention, while the magistrate judge who ruled on the landowners' motion to intervene denied intervention