_____

No. 95-1201MN
_____


Jeffrey Mausolf; William            *
Kullberg; Arlys Strehlo; and        *
Minnesota United Snowmobilers       *
Association,                        *
                                    *
        Appellees,                  *
                                    *
    v.                              *
                                    *
                                    *
Bruce Babbitt, Secretary,           *
Department of the Interior;         *
Roger Kennedy, Director,            *
National Park Service; Mollie       *
Beattie, Director, U.S. Fish        *   On Appeal from the United
and Wildlife Service; and Ben       *   States District Court
Clary, Superintendent,              *   for the District of
Voyageurs National Park,            *   Minnesota.
                                    *
        Appellees.                  *
                                    *
    ----------------------        *
                                    *
Voyageurs Region National Park      *
Association; Sierra Club, North *
Star Chapter; Humane Society of *
the United States; Friends of       *
the Boundary Waters Wilderness; *
National Park and Conservation      *
Association; and Izaak Walton       *
League of America,                  *
                                    *
        Appellants.                 *


                    _____

            Submitted:  October 20, 1995

                Filed:  June 3, 1996
                    _____

Before RICHARD S. ARNOLD, Chief Judge, WOLLMAN and MORRIS SHEPPARD ARNOLD,
     Circuit Judges.
                          _____

RICHARD S. ARNOLD, Chief Judge.


     The plaintiffs -- three snowmobile enthusiasts and the Minnesota
United Snowmobilers Association (collectively, "the Snowmobilers") -- sued
the Secretary of the Interior and other defendants ("the Government"),
seeking to enjoin the enforcement of restrictions on snowmobiling in
Voyageurs National Park.  The Voyageurs Region National Park Association
and other conservation groups (collectively, "the Association") moved to
intervene under Fed. R. Civ. P. 24.  The Association claimed an interest
in the vigorous enforcement of the restrictions and expressed concern that
the Government might settle with the Snowmobilers or back away from the
rules.  The District Court denied the motion, concluding that the
Government adequately represented the Association's interests.  Mausolf v.
Babbitt ("Mausolf I"), 158 F.R.D. 143 (D. Minn. 1994) (opinion of
Magistrate Judge), approved, Order of November 15, 1994 (order of District
Judge).  We reverse.


     During the pendency of this appeal, the District Court granted the
Snowmobilers' motion for summary judgment, and held that the Government's
explanation for the restrictions was inadequate under the Endangered
Species Act.  The Court remanded the case to the Fish and Wildlife Service
and the Park Service to supplement the administrative record, and enjoined
enforcement of the restrictions on snowmobiling, "[p]ending a sufficient
explanation . . .."  Mausolf v. Babbitt ("Mausolf II"), 913 F. Supp. 1334,
1344 (D. Minn. 1996).  We think, however, that the question of intervention
is not moot, because the Association has appealed this judgment.  Jeffrey
Mausolf v. Voyageurs Region National Park Ass'n, No. 96-1856 (8th Cir.,
notice of appeal filed March 25, 1996).

-2-

Voyageurs National Park is a watery maze of over 30 lakes and 900 islands along the border between northern Minnesota and Canada. The Park's name pays tribute to the fur traders and explorers who travelled by canoe from Montreal deep into northwestern Canada.[1] The Park's four largest lakes -- Rainy, Kabetogama, Namakan, and Sand Point -- surround the Kabetogama Peninsula (about one-half the Park's land area) and are themselves linked by smaller lakes, rivers, and bogs. Most of the Park is quite remote, and accessible only by water. Voyageurs is renowned for its fishing and boating, and visitors often see bald eagles and grey wolves in the wild. Voyageurs has also long been a popular destination for snowmobilers, who have, over the years, used both the Park's frozen lake surfaces and -- more controversially -- certain overland trails. This case is the latest in a series of disputes over the use and management of the Park.[2]

Some background information will make this case easier to understand. In 1991, after several years of study, the National Park Service issued final regulations, based on a series of environmental- and wildlife-impact reports, allowing snowmobiling on practically all the Park's lake surfaces and also on certain

---

[1]In 1971, Congress authorized the establishment of the Park

> . . . to preserve, for the inspiration and enjoyment of present and future generations, the outstanding scenery, geological conditions, and waterway system which constituted a part of the historic route of the Voyageurs who contributed significantly to the opening of the Northwestern United States.

Voyageurs National Park Act, 16 U.S.C. § 160 et seq.

[2]For more on the litigation surrounding the Park, see, e.g., Voyageurs Region National Park Association v. Lujan ("VRNPA"), 1991 WL 343370 (D. Minn., April 15, 1991), aff'd, 966 F.2d 424 (8th Cir. 1992).

trails and portage routes.  See 36 C.F.R. § 7.33(b) (1991).[3]  The Association then sued, claiming that the regulations, and the Department of the Interior's failure to submit a "wilderness recommendation" for the Park to the President, were illegal.[4]  The District Court ordered the Secretary of the Interior to make a "wilderness recommendation" within a year, but refused to enjoin snowmobiling in the Park's Kabetogama Peninsula.  See VRNPA, 1991 WL 343370 at *11-14.

Accordingly, in August 1991, the National Park Service proposed a wilderness plan which would have significantly reduced overland snowmobiling, but allowed it on major lakes, a few designated portage trails, and the Chain of Lakes Trail.  The Park Service then asked the Fish and Wildlife Service for its "biological opinion" about the effect, if any, snowmobiling could have on grey wolves, bald eagles, and other animals in the Park.  In March 1992, Fish and Wildlife concluded that the Park Service's plan would not threaten animals' survival or habitats.  Nonetheless, Fish and Wildlife directed the Park Service to close specified trails, lakeshores, and lakes to snowmobiles and other motor vehicles.  So, in December 1992, Park officials issued an

---

[3]The Voyageurs National Park Act, recognizing the Park's longstanding appeal to snowmobilers, provided that "[t]he Secretary may, when planning development of the park, include appropriate provisions for (1) winter sports, including the use of snowmobiles, . . .."  16 U.S.C. § 160h.  After the Park was established, snowmobiling continued relatively unregulated, pending the results of wildlife-impact studies.  See Mausolf II, 913 F. Supp. at 1338.

[4]The Association argued that the Voyageurs National Park Act, 16 U.S.C. § 160 et seq., and the Wilderness Act of 1964, 16 U.S.C. § 1131 et seq., required the Secretary of the Interior to submit a "wilderness recommendation" for the Park to the President within four years of the Park's establishment, and that the Secretary had not complied with this requirement.  VRNPA, 1991 WL 343370 at *1-2.  The Association also contended that the Wilderness Act, the Voyageurs National Park Act, and Department of the Interior regulations, see 36 C.F.R. § 2.18(c), prohibited the Park from allowing widespread snowmobiling in potential wilderness areas.  VRNPA, 1991 WL 343370 at *1-3.

order, without giving notice or inviting interested parties to comment, closing 16 of the Park's lake bays and certain shoreline areas to winter motorized access. See 36 C.F.R. § 7.33(b)(3) (1993) (authorizing temporary closure of lake surfaces for wildlife-management purposes). This order, which was renewed in 1993 and 1994, dramatically reduced the area available for snowmobiling.

These new regulations angered many past and potential Park visitors, including the Snowmobilers, who could no longer enjoy some of the Park's more beautiful and remote areas. The Snowmobilers sued the Government in January 1994, claiming that Fish and Wildlife's biological opinion did not support closing so much of the Park, and that the regulations were therefore arbitrary and capricious. According to the Snowmobilers, not only had the Government turned an abrupt and unexplained "about face," it had also failed to consider the best available scientific and commercial information before imposing the new restrictions. See Mausolf II, 913 F. Supp. at 1335-36; Mausolf I, 158 F.R.D. at 144-45. The Association then moved to intervene so it could vindicate its interest in restricting snowmobiling in the Park and in making sure the new regulations were strictly enforced. The Association contended that for years the Government illegally -- and over the Association's objections -- permitted unrestricted snowmobiling in the Park and refused to implement proper wilderness-protection measures. The Association asserts that the Government cannot be trusted to protect the Association's interests because of its alleged history of siding with the Snowmobilers. See Mausolf I, 158 F.R.D. at 147.

The District Court conceded that the Association had a recognized interest which might be impaired by the disposition of the case. The Court noted, however, that, under the parens patriae doctrine, government entities are presumed to represent the interests of all their citizens. Would-be intervenors can rebut

this "presumption of adequate representation" only by identifying their "local and individual interests not shared by the general citizenry." Mausolf I, 158 F.R.D. at 147-48 (citing Mille Lacs Band of Chippewa Indians v. Minnesota, 989 F.2d 994, 1001 (8th Cir. 1993)). The District Court was not persuaded that the Government would unduly subordinate the Association's interests to more general, national interests, and, therefore, denied intervention as of right under Rule 24(a). The District Court also refused to exercise its discretion to allow permissive intervention under Rule 24(b), fearing that the Association might delay the case with additional discovery and further joinder of issues and parties. Mausolf I, 158 F.R.D. at 148. However, recognizing the potential benefits of the Association's collective knowledge and perspective, the Court allowed the Association to participate as amicus curiae and to file a memorandum addressing the parties' cross-motions for summary judgment. Ibid. The District Court confirmed the Magistrate Judge's order, and the Association appealed. We reverse.

## II.

The Snowmobilers contend that the Association may not intervene as of right because it lacks Article III standing. The Magistrate Judge concluded, and the District Judge agreed, that "[t]he question of standing . . . is irrelevant to our determination of whether the Association may intervene as of right." Mausolf I, 158 F.R.D. at 146. The District Court said that even if the Association did not have standing to sue, it could still intervene under Rule 24(a) if it had a "recognized interest in the subject of the litigation." Id. at 146 n.4 (citing Mille Lacs, 989 F.2d at 997).

### A.

Rule 24(a) says nothing about standing. To intervene as of

-6-

right, an applicant must (1) have a recognized interest in the subject matter of the litigation that (2) might be impaired by the disposition of the case and that (3) will not be adequately protected by the existing parties. Mille Lacs, 989 F.2d at 997. As the District Court observed, the Supreme Court has not yet decided whether a would-be intervenor must have Article III standing. See Diamond v. Charles, 476 U.S. 54, 68-69 & n.21 (1986) (an intervenor may not appeal, or continue a suit, without the party on whose side intervention was permitted, unless intervenor has Article III standing).[5]

The courts of appeals have taken diverse, sometimes "anomalous," id. at 68, approaches. By way of illustration, at least one circuit has held that Article III standing is required to intervene, see, e.g., Building and Const. Trades Dept., AFL-CIO v. Reich, 40 F.3d 1275, 1282 (D.C. Cir. 1994); another has stated that, while Article III standing is not required, it is "relevant" to identifying the "interest" required for intervention under Rule 24, see, e.g., Chiles v. Thornburgh, 865 F.2d 1197, 1213 (11th Cir. 1989); others have concluded that standing is not required for intervention, see, e.g., United States Postal Service v. Brennan, 579 F.2d 188, 190 (2d Cir. 1978); Associated Builders & Contractors v. Perry, 16 F.3d 688, 690 (6th Cir. 1994); Yniguez v. State of Arizona, 939 F.2d 727, 731 (9th Cir. 1991); and still another has suggested that Rule 24 requires an interest even "greater than the interest sufficient to satisfy the standing requirement." See,

---

[5]The Court observed that

the precise relationship between the interest required to satisfy [Rule 24] and the interest required to confer standing . . . has led to anomalous decisions in the Courts of Appeals. We need not decide today whether a party seeking to intervene before a district court must satisfy not only the requirements of Rule 24(a)(2), but also the requirements of Art. III.

476 U.S. at 68-69 (footnote omitted).

e.g., United States v. 39.96 Acres of Land, 754 F.2d 855, 859 (7th Cir. 1985), cert. denied, 476 U.S. 1108 (1986). Our Court has not yet taken a firm position in this debate, although we have, in some cases, decided intervention issues without discussing Article III standing.[6]

The Association urges us to adopt the "majority view," and to hold that standing is not required for intervention. It contends that "[i]ntervention is not a means for beginning a lawsuit, but a mechanism that allows all parties with an interest to participate in an existing lawsuit." Because the lawsuit's original parties have created the "case" or "controversy" required by Article III, the Association argues, there is no reason to require a would-be intervenor, who satisfies Rule 24(a)'s requirements, to have standing. In support, the Association points to the following language from Chiles, supra:

> The standing doctrine ensures that a justiciable case and controversy exists between the parties. Intervention under Rule 24 presumes that there is a justiciable case into which an individual wants to intervene. . . . [A] party seeking to intervene need not demonstrate that he has standing in addition to meeting the requirements of Rule 24 as long as there exists a justiciable case and controversy between the parties already in the lawsuit.

Chiles, 865 F.2d at 1212-13.

---

[6]See, e.g., United States v. Union Elec. Co., 64 F.3d 1152, 1158-70 (8th Cir. 1995); Mille Lacs, 989 F.2d at 997; Sierra Club v. Robertson, 960 F.2d 83, 85 (8th Cir. 1992); County of St. Louis v. Thomas, 162 F.R.D. 583, 586 n.9 (D. Minn. 1995) ("[T]he Eighth Circuit resolves questions of intervention without reference to the standing doctrine."); but see United States v. Metropolitan St. Louis Sewer Dist., 883 F.2d 54, 56 (8th Cir. 1989) (noting that proposed intervenors' allegations were "sufficient to give [them] constitutional standing").

We are not so sure as the Association that there is a "majority view" on this question--indeed, our survey of the cases reveals considerable diversity of views, not consensus. But even if the Association's position did represent the majority view, we would still disagree with it. We conclude that the Constitution requires that prospective intervenors have Article III standing to litigate their claims in federal court.

B.


Our Constitution is a charter for limited government. Article III limits the "judicial power" to "cases" and "controversies." U.S. Const., art. III., § 2, cl. 1. From this "bedrock requirement," <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 471 (1982), flow several doctrines -- <u>e.g.</u>, standing, mootness, ripeness, and political question -- which "state fundamental limits on federal judicial power in our system of government." <u>Allen v. Wright</u>, 468 U.S. 737, 750 (1984). Article III's standing requirement is a restraint on the "judicial power" as unyielding as that placed on Congress by, for example, the First Amendment.


Rule 24(a) speaks to practical concerns by requiring that intervenors have a recognized interest in the subject matter of the litigation which might be impaired by the disposition of the case and which will not be adequately protected by the existing parties. See <u>New Orleans Public Service, Inc. v. United Gas Pipe Line Co.</u>, 732 F.2d 452, 464 (5th Cir.) (analogizing intervention requirements to prudential standing rules), <u>cert. denied</u>, 469 U.S. 1019 (1984). The Rule promotes the efficient and orderly use of judicial resources by allowing persons, who might otherwise have to bring a lawsuit on their own to protect their interests or vindicate their rights, to join an ongoing lawsuit instead. But, judicial economy and the Rules of Civil Procedure notwithstanding, Congress cannot circumvent Article III's limits on the judicial power. See

<u>Seminole Tribe of Florida v. Florida</u>, 116 S. Ct. 1114, 1128 (1996) (it is "fundamental that Congress could not expand the jurisdiction of the federal courts beyond the bounds of Article III"); <u>Valley Forge</u>, 454 U.S. at 471-75 (". . . [N]either the counsels of prudence nor the policies implicit in the `case or controversy' requirement should be mistaken for the rigorous Art. III requirements themselves."); <u>Gladstone, Realtors v. Village of Bellwood</u>, 441 U.S. 91, 100 (1979) ("<u>In no event</u> . . . may Congress abrogate the Art. III minima . . ..") (emphasis added). Congress could no more use Rule 24 to abrogate the Article III standing requirements than it could expand the Supreme Court's original jurisdiction by statute. See <u>Marbury v. Madison</u>, 1 Cranch 137 (1803).

The Association's position is that once an Article III case or controversy is underway, anybody who satisfies Rule 24's requirements may then join in. As long as the original parties are involved, the Association insists, the lawsuit remains within the scope of the federal "judicial power." We disagree. In our view, an Article III case or controversy, once joined by intervenors who lack standing, is -- put bluntly -- no longer an Article III case or controversy. An Article III case or controversy is one where all parties have standing, and a would-be intervenor, because he seeks to participate as a party, must have standing as well. The Supreme Court has made it very clear that "[t]hose who do not possess Art. III standing may not litigate as suitors in the courts of the United States." <u>Valley Forge</u>, 454 U.S. at 475-76; see also <u>Allen</u>, 468 U.S. at 750-51 ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.") (citation omitted). Because an intervenor seeks to become a "suitor," and asks the court to "decide the merits of the dispute," he must not only satisfy the requirements of Rule 24, he must also have Article III standing. See <u>Building and Const. Trades</u>, 40 F.3d at 1282 ("[B]ecause an intervenor participates on an equal footing with the

original parties to a suit, a movant for leave to intervene under Rule 24(a)(2) must satisfy the same Article III standing requirements as the original parties.").[7]

The standing requirement is, at its core, a constitutionally mandated prerequisite for federal jurisdiction, and "an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 561 (1992) (elements of standing doctrine are not "mere pleading requirements" but are "indispensable part" of case). The Supreme Court has often emphasized that a lawsuit in federal court is not a forum for the airing of interested onlookers' concerns, nor an arena for public-policy debates. See, e.g., Valley Forge, 454 U.S. at 473 (Article III "forecloses the conversion of courts of the United States into judicial versions of college debating forums."). While Rule 24 promotes judicial economy by facilitating, where constitutionally permissible, the participation of interested parties in others' lawsuits, the fact remains that a federal case is a limited affair, and not everyone with an opinion is invited to attend.

## III.

Having decided that those wishing to intervene in federal court must have Article III standing, we must now determine whether the Association passes this test. We think it does. In Lujan, the Supreme Court held that the "irreducible constitutional minimum of standing" required by Article III has three elements: First, the would-be litigant must have suffered an "injury in fact"; that is,

---

[7]See also City of Cleveland, Ohio v. NRC, 17 F.3d 1515, 1516-1517 (D.C. Cir. 1994); Cook v. Boorstin, 763 F.2d 1462, 1470 (D.C. Cir. 1985) ("[A]n intervenor of right, just like an ordinary plaintiff, must have standing."); Southern Christian Leadership Conference v. Kelley, 747 F.2d 777, 779 (D.C. Cir. 1984) (Article III requires that Rule 24 "interest" requirement be interpreted to refer only to "legally protectable interests").

an "invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . .." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted). Second, the would-be litigant must establish a causal connection between the alleged injury and the conduct being challenged. Ibid. Third, he must show that the injury is likely to be redressed by a favorable decision. Id. at 561; see Friends of the Boundary Waters Wilderness v. Thomas, 53 F.3d 881, 886 (8th Cir. 1995) (standing requires (1) injury in fact, (2) causation, and (3) redressability).

As we noted in Sierra Club v. Robertson, 28 F.3d 753, 758 (8th Cir. 1994), "[c]omplaints of environmental and aesthetic harms are sufficient to lay the basis for standing." See also Lujan, 504 U.S. at 562-63 ("[T]he desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purpose of standing."). The injuries alleged, however, must be imminent and direct, not hypothetical or fantastic. In Lujan, the Court emphasized that vague expressions of a hope to observe animals, in remote countries half-way around the world, "someday," could not establish the constitutionally required "actual or imminent injury." Id. at 563-64. For example, one member of the environmental group in Lujan said that she hoped to visit Sri Lanka someday and see leopards and elephants. When pressed, however, she admitted that her "hope" was not and could not be a "plan," because of a civil war. Id. at 564.

The alleged injuries in Lujan were far more speculative than those alleged here. In this case, the Association has submitted affidavits from several of its members stating that they have visited the Park in the past, that they plan to do so in the near and identifiable future, and that they will be injured directly if the restrictions on snowmobiling are lifted. Jennifer Hunt, Executive Director of the Voyageurs Region National Park

Association, swore that she visits the Park at least twice a year, and described specific, imminent, future trips she had planned. She described her activities in the Park and how she thinks she would be affected if the restrictions on snowmobiling were lifted. Joe Kotnik, another member, submitted a similarly detailed affidavit. These members claim that snowmobiling will threaten the Park's eagles and wolves and detract from their enjoyment of the Park's tranquility and beauty. The Association has alleged concrete, imminent, and redressable injuries in fact, which are neither "conjectural" nor "hypothetical." Cf. Lujan, 504 U.S. at 567 (rejecting environmental group's claims of injury as "pure speculation and fantasy"); Sierra Club, 28 F.3d at 758-60 (asserted injuries were only potential, not imminent; challenged forest plan was merely a general planning tool).

In fact, the Association's case for Article III standing is basically the same as the Snowmobilers'. The District Court held that the Snowmobilers have standing because they have shown that

> they have used and wish to continue using the Park's now-restricted areas for snowmobiling and wildlife observation. Plaintiffs claim they have been harmed by the closures because they are prevented from observing wolves in their natural habitat. Plaintiffs also contend they have been injured because the closures were imposed without a proper basis . . ..

Mausolf II, 913 F. Supp. at 1341. Thus, the District Court held, the Snowmobilers had alleged concrete, particularized, and immediate injuries, which were caused by the restrictions on snowmobiling and which could be redressed by the relief the Snowmobilers seek. Ibid. The same is true, mutatis mutandis, for the Association.

This case is a lot like Friends of the Boundary Waters, supra. There, an environmental group challenged certain portions of the

-13-

Superior National Forest's management plan.  The plan would have allowed motorized portages in the Boundary Waters Canoe Area Wilderness and would have increased below-cost timber sales.  53 F.3d at 883-84.  The environmental group's members filed affidavits "replete with allegations of the injuries that would result from the Plan's proposed increase in below-cost timber sales."  Id. at 886.  The district court had found that the planned timber sales would damage certain tree species and reduce tree diversity, and that the group's alleged injuries would likely be redressed by returning to the pre-plan levels of below-cost timber sales.  Therefore, we held that the environmental group had Article III standing.  Id. at 886-87.  We distinguished Sierra Club, 28 F.3d 753 (8th Cir. 1994), noting that the forest plan in that case was a general planning tool for the future, while the plan at issue in Friends of the Boundary Waters explicitly identified the area to be harvested.  Friends, 53 F.3d at 887.  The snowmobiling restrictions at issue in this case are similarly definite and imminent.  We therefore hold that the Association has the Article III standing required for intervention in this lawsuit.

IV.

Because the Association has standing, the District Court could have granted the motion to intervene.  We must now decide whether it should have.  The District Court denied the motion for intervention as of right and for permissive intervention, and instead permitted the Association to participate as amicus curiae.  Mausolf I, 158 F.R.D. at 148.  The District Court reasoned that the Association's interests were adequately protected by the government, id. at 147-48, and that, if permitted to intervene, the Association would likely prejudice the rights of the original parties by delaying the case with additional discovery.  Id. at 148.  We review the District Court's denial of the Association's motion to intervene as of right de novo, Sierra Club v. Robertson, 960 F.2d 83, 85 (8th Cir. 1992).  Because we conclude that the

-14-

Association should have been allowed to intervene as of right, we need not discuss whether the District Court abused its discretion by not granting permissive intervention.

We agree with the District Court that the Association has an interest in preventing unrestricted snowmobiling and in vindicating a conservationist vision for the Park. The Association has consistently demonstrated its interest in the Park's well-being (as it sees it) and has worked hard over the years, in various proceedings, to protect that interest. See Mausolf I, 158 F.R.D. at 146-47. We also agree with the District Court's conclusion that the Association's interests might suffer if the Government were to lose this case, or to settle it against the Association's interests. Id. at 147. The only question left for us to consider, then, is whether the District Court correctly held that Association's interests were adequately protected by the Government.

Usually, Rule 24(a)'s third criterion is easy to satisfy, and the would-be intervenor faces a "minimal burden" of showing that its interests are not adequately represented by the parties. Mille Lacs, 989 F.2d at 999. But when one of the parties is an arm or agency of the government, and the case concerns a matter of "sovereign interest," the bar is raised, because in such cases the government is "presumed to represent the interests of all its citizens." Id. at 1000 (citation omitted); United States v. Union Elec. Co., 64 F.3d 1152, 1168-69 (8th Cir. 1995). We emphasize that the parens patriae presumption applies "in such cases" because it does not necessarily apply in all cases to which the government is a party. After all, when the proposed intervenors' concern is not a matter of "sovereign interest," there is no reason to think the government will represent it. See Mille Lacs, 989 F.2d at 1001 (parens patriae doctrine did not apply because "[t]he counties' interests in land are narrower interests not subsumed in the general interest Minnesota asserts in protecting fish and game");

-15-

Union Elec. Co., 64 F.3d at 1170 (holding that EPA did not adequately represent proposed intervenors' "parochial" interest in avoiding liability).

Here, however, we agree with the District Court that the Association's conservation interests are concerns that the Government, as parens patriae, is charged with protecting, and that the presumption of adequate representation therefore applies in this case. See Mausolf I, 158 F.R.D. at 147. This presumption may be rebutted, though, when a would-be intervenor makes a strong showing of inadequate representation. See 7C Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1909 (2d ed. 1986). That is, the presumption of adequate representation may be "rebutted by a showing that the applicant's interest cannot be subsumed within the shared interest of the citizens . . .." Union Elec. Co., 64 F.3d at 1169.

The Association has rebutted the parens patriae presumption in this case. Its concerns about the Government's enthusiasm for defending the snowmobiling restrictions are not grounded, as the Snowmobilers charge, in a nebulous and paranoid "distrust of government," but in the well-documented history of this particular case and controversy. The Association sued the Government in an earlier case concerning snowmobiling in the Park precisely because it thought the Government was not adequately representing the Association's interests. See VRNPA, supra. In fact, this earlier lawsuit is probably the reason for the current regulations. It is unquestioned that, in the past, the Government has waived and failed to enforce regulations against snowmobile use in the Park. Id. at *8. The Government also "breached [its] obligation under the Voyageurs National Park Act to make a wilderness recommendation within four years of . . . the park's establishment." Id. at *11.

The Snowmobilers insist that the Government, like the Association, is interested in protecting wildlife and in upholding

environmental regulations.  See <u>Mausolf I</u>, 158 F.R.D. at 147 ("The Defendants represent the citizenry on matters of wildlife and wilderness preservation . . ..")  This is true; it does not, however, answer the Association's objection that this interest is not adequately represented by the Government in this case.  Unlike the Association, the Government is "obliged to represent . . . all of its citizens." <u>Sierra Club</u>, 960 F.2d at 86; see also <u>In re Sierra Club</u>, 945 F.2d 776, 780 (4th Cir. 1991) (noting that "[a]lthough the interests of the Sierra Club and [the Government] may converge . . . they may [also] diverge . . ..").  When managing and regulating public lands, to avoid what economists call the "tragedy of the commons," the Government must inevitably favor certain uses over others.  The Park was established for both recreational and conservationist purposes.  Voyageurs National Park Act, 16 U.S.C. § 160 <u>et seq.</u>  These purposes will sometimes, unavoidably, conflict, and even the Government cannot always adequately represent conflicting interests at the same time.  See <u>Sierra Club</u>, 960 F.2d at 86 (contrasting State of Arkansas's many competing interests with those of environmental group); <u>United States v. Reserve Mining Co.</u>, 56 F.R.D. 408, 419 (D. Minn. 1972) ("The United States is charged with representing a broad public interest and . . . must represent varying interest[s], industry as well as individuals.").  In this case, the Government's interest in promoting recreational activity and tourism in the Park, an interest many citizens share, may be adverse to the Association's conservation interests, interests also shared by many.

V.

In conclusion:  The Constitution requires that Rule 24 intervenors have Article III standing; the Association has standing; and it has rebutted any presumption that the Government will adequately represent its interests in this litigation.  Therefore, the District Court should have allowed the Association to intervene as of right.  The District Court's order denying

-17-

intervention is reversed.  The District Court is directed to enter an order granting the Association's motion for leave to intervene as of right.

WOLLMAN, Circuit Judge, concurring and dissenting.

I concur in all of the court's opinion except the holding that a party seeking to intervene must have Article III standing.  On that issue, I agree with the arguments advanced by the Association, as so well restated in the court's opinion.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

I concur in all of the court's opinion except the holding that the presumption that the government is acting as parens patriae has been rebutted.

In order to qualify as one of the "very rare cases in which a member of the public is allowed to intervene in an action in which the United States ... represents the public interest," the Association must make "a very strong showing of inadequate representation."  7C Wright et al., supra, § 1909 at 342-43.  The Association asserts that the government's prior failures to embrace its view of the proper emphasis to place on conservation suffice to make that showing, but I do not think that they do.  Although the Association and the government have differed over the issues relevant to this case in the past, the government has more recently demonstrated a strong inclination to champion the Association's environmental concerns.  In fact, as the court itself observes, the Snowmobilers initiated this case because the government's snowmobiling limitations were more restrictive than those proposed in the 1991 wilderness plan, even though the Fish and Wildlife Service concluded that the wilderness plan posed no threat whatever to Park wildlife.  The Association points to no specific evidence that the government has not diligently defended the relevant

restrictions, or that it is likely to become irresolute in this respect in the future. In such circumstances, I cannot conclude that the Association has made a showing, much less a "very strong showing," id., of inadequate representation by the government.

In fact, the present interests of the government and the Association are essentially identical, both tactically and substantively. See Sierra Club, 960 F.2d at 86. Both seek the continued enforcement of the snowmobiling restrictions. By doing so, both seek to prevent snowmobiling in large areas of the Park, thereby preserving the Park's tranquility and going the extra mile to protect Park wildlife. It is true that conservation is but one of a panoply of interests that the government is obliged to represent. Id. But the fact that government is charged with representing the interests of all citizens, and that some citizens do not share the Association's zeal for conservation, is not enough to overcome the presumption of adequate representation. If it were, the parens patriae doctrine would serve no useful purpose, because it would be rebutted in virtually every case. It is important to understand that the government is not obliged to be as zealous about conservation as the Association is. It is merely obliged to be properly solicitous of conservation as one use among the many competing uses to which parks can be put. There is simply insufficient evidence in this record to rebut the presumption of proper governmental solicitousness.

I therefore respectfully dissent.

A true copy.

        Attest:


            CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-19-